UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
-------------------------------------------------------------------X
DANI BUTLER
1312 Turtle Cove, Ballwin, MO 63011;

YOUNG HWA CHUNG KIM
1750 Elmhurst Road #427, Des Plains, IL 60019;

               and

CHUN KOOK KIM
50 Yorktown Shopping Center # 349, Lombard, IL 60148

               Plaintiffs,
           -against-
DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA
a/k/a North Korea
c/o Foreign Minister Ri Son-gwon
Ministry of Foreign Affairs
Jung song-dong; Central District
Pyong Yang, DRK

               Defendant.
-------------------------------------------------------------------X

Case no. 20-cv-2514

## **COMPLAINT**

Plaintiffs, by their counsel, complain of the Defendant, and hereby allege for their Complaint as follows:

## **INTRODUCTION**

1. This is a civil action for wrongful death, personal injury and related torts pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602, *et seq*., brought by United States citizens whose husband and father, Reverend Kim Dong Shik ("Reverend Kim"), was

abducted on January 16, 2000 by officials, employees and agents of Defendant Democratic People's Republic of Korea ("North Korea"), and was then tortured and murdered (the "Kidnapping and Murder").

2.  Other members of the family of Reverend Kim have previously filed suit in this Court regarding the Kidnapping and Murder. Following a decision from the D.C. Circuit Court of Appeals determining North Korea's liability for the Kidnapping and Murder, *Han Kim v. Democratic People's Republic of Korea,* 413 U.S. App. D.C. 356 (2014), this Court entered judgment in favor of those relatives for the damages they each had suffered. *Han Kim v. Democratic People's Republic of Korea,* 87 F. Supp. 3d 286 (D.D.C. 2015).

3.  This Court previously found the Defendant North Korea liable for the Kidnapping and Murder of Reverend Kim and issued a judgment against them, in favor of Reverend Kim's son Han Kim in the amount of $15 million in compensatory damages, and in favor of Reverend Kim's brother Yong Kim in the amount of $15 million in compensatory damages, plus $300 million in punitive damages. *Han Kim v. Democratic People's Republic of Korea,* 87 F. Supp. 3d 286 (D.D.C. 2015) ("Prior Judgment").

## JURISDICTION AND VENUE

4.  This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1330-1332, 1367, 1605 note, and 1605A(a). Venue is proper in this Court pursuant to 28 U.S.C. § 1391(f)(4) and the rules of pendent venue.

## THE PARTIES

5.  Plaintiff Dani Butler is the daughter of Reverend Kim. Plaintiff Dani Butler became an American citizen in June 2004 and remains today a United States citizen. As the result of her father's abduction, torture and murder, Plaintiff Dani Butler has experienced the loss of her father's

society, companionship, comfort, advice and counsel and has suffered severe mental anguish, extreme emotional distress and solatium damages.

6. Plaintiff Young Hwa Chung Kim was the wife of Reverend Kim. Plaintiff Young Hwa Chung Kim became an American citizen in 2007 and remains a United States citizen today. As the result of her husband's abduction, torture and murder, Plaintiff Young Hwa Chung Kim experienced the loss of her husband's society, companionship, comfort, advice and counsel and has suffered severe mental anguish, extreme emotional distress and solatium damages.

7. Chun Kook Kim is the son of Reverend Kim and the stepbrother of Plaintiff Dani Butler. Plaintiff Chun Kook Kim became an American citizen in 2007 and remains a United States citizen today. As the result of his father's torture and murder, Plaintiff Han Kim has experienced the loss of his father's society, companionship, comfort, advice and counsel and has suffered severe mental anguish, extreme emotional distress and solatium damages.

8. Defendant Democratic People's Republic of Korea ("North Korea"), through its officials, employees and agents, intentionally ordered, directed and caused the torture and murder of Reverend Kim and the resulting harm to Plaintiffs herein.

9. Defendant North Korea is a foreign state within the meaning of 28 U.S.C. § 1603.

## UNDERLYING FACTS

### A. Relevant Background

10. Defendant North Korea is a one-party totalitarian state modeled as a Stalinist dictatorship. North Korea's supreme leader Kim Jong-un rules over his citizens with an iron fist, limits all political and economic freedoms and tolerates no dissent. Every aspect of social, political, and economic life is tightly controlled by the state. Human rights organizations have identified North Korea as one of the most repressive regimes in the world, with a brutal record of human

rights violations. Those who have managed to escape from North Korea have reported that torture, starvation, rape, medical experimentation, forced labor and murder are utilized by the regime and its security services to maintain control over the population. The death penalty is regularly imposed on those accused of even minor political infractions against the state.

11. In another case, this Court has recently described the testimony of an expert about the North Korean regime as follows:

> A deeply knowledgeable expert from the Fletcher School of Law and Diplomacy at Tufts University describes North Korea as "unique" in the world today: North Korea is the "most advanced, most perfected totalitarian state in world history," H'rg Tr. (Rough) at 105, 110 (Expert Prof. Sung-Yoon Lee), and has "perfected its means of terrorizing" both its own people and others, *id.* at 111. The dictator who leads North Korea, and his cronies, "show[] no regard for human life," *id.* at 127, creating, for example, a "manmade…famine" in the late 1990s that killed "upwards of 2 million people," *id.*, and maintaining "political prisoner concentration camps," *id.* at 110, such that "North Korean escapees" tell "a consistent story" of "a life of extreme deprivation and repression," *id.* at 111. Moreover, North Korea is "unprecedented" in its state sponsorship of "elicit activities, like proliferation of weapons of mass destruction, counterfeiting U.S. dollars, [and] the production and sale of drugs like opium, heroin, and meth[amphetamines]." *Id.* at 106. Indeed, North Korea is the world's "leading" and "best qualified candidate for indictment" at the International Criminal Court for crimes against humanity. *Id.* at 122. An American family, the Warmbiers, experienced North Korea's brutality first-hand when North Korea seized their son to use as a pawn in that totalitarian state's global shenanigans and face-off with the United States. As Otto's mother said, "there's evil in this world," *id.* at 82 (C.W.), and "[i]t's North Korea," *id.*

*Warmbier,* 356 F. Supp. 3d at 36.

12. Defendant North Korea has frequently abducted and imprisoned foreign citizens. In 2002, North Korea publicly admitted that its security services had engaged in the kidnapping of Japanese citizens between 1977 and 1983. While some surviving victims and their families were allowed to leave North Korea and return to Japan, numerous other cases of Japanese detainees remain unresolved. In October 2005, North Korea acknowledged for the first time having

-4-

kidnapped South Korean citizens in previous decades, claiming that several abductees, as well as several POWs from the Korean War, were still alive in North Korea. South Korea asserts that nearly 500 of its citizens have been abducted and imprisoned by North Korea since the end of World War II.

13. Pursuant to the official policy of North Korea prior to and leading up to Reverend Kim's abduction, torture and murder, North Korea's official security services actively hunted down and abducted refugees and defectors who had crossed into China, as well as other perceived enemies of the regime, and brought these captives to North Korea where they were imprisoned, tortured and frequently murdered. The U.S. Department of State has confirmed that North Korea vigilantly pursues and abducts refugees and defectors wherever they can locate them:

> NGO, think tank, and press reports indicated the government was responsible for disappearances. South Korean media reported Ministry of State Security agents were dispatched to cities in China near the DPRK border to kidnap and forcibly return refugees. According to international press reports, North Korea may have also kidnapped defectors traveling in China after relocating to South Korea. In some cases North Korea reportedly forced these defectors' family members to encourage the defectors to travel to China in order to capture them….
>
> South Korean government and media reports noted the DPRK also kidnapped other foreign nationals from locations abroad in the 1970s and 1980s. The DPRK continued to deny its involvement in the kidnappings. The UN special rapporteur on the situation of human rights in the DPRK reported South Korea officially recognized 516 South Korean civilians abducted by DPRK authorities since the end of the Korean War with thousands more unaccounted for. South Korean NGOs estimated that 20,000 civilians abducted by the DPRK during the Korean War remained in the North or had died.

U.S. State Department publication, *2019 Country Reports on Human Rights Practices: Democratic People's Republic of Korea*.

14. The U.S. Department of State has also confirmed that those imprisoned in North Korea are subjected to torture and physical abuse:

Methods of torture and other abuse reportedly included severe beatings, electric shock, prolonged periods of exposure to the elements, humiliations such as public nakedness, confinement for up to several weeks in small "punishment cells" in which prisoners were unable to stand upright or lie down, being forced to kneel or sit immobilized for long periods, being hung by the wrists, being forced to stand up and sit down to the point of collapse, and forcing mothers recently repatriated from China to watch the infanticide of their newborn infants. Defectors continued to report that many prisoners died from torture, disease, starvation, exposure to the elements, or a combination of these causes.

During the year Shin Dong-hyuk, a defector born and confined in a political prison camp in Kaechon in South Pyongan Province for 22 years, explained that beatings and torture were a common occurrence within the camp. Shin reported that he was tortured with hot coals while being hung from the ceiling after members of his family tried to escape from the camp.

In 2006 a defector reported that, upon his repatriation from China in 2000, authorities forced him to crouch for long periods of time with a wooden pole placed between his calves and thighs; while crouching, booted guards would stomp on the top of his legs, crushing his toes and hyperextending his knees. He also reported that interrogators forced him to kneel forward onto fire-heated iron plates.

In 2005 a defector reported that she lost the use of her feet due to severe beatings she received from police for attempting to leave the country…. Reports indicated that conditions in the political prison camps were harsh. Systematic and severe human rights abuses occurred throughout the prison and detention system. Detainees and prisoners consistently reported violence and torture. According to refugees, in some places of detention, prisoners received little or no food and were denied medical care.

U.S. State Department publication, *2007 Country Reports on Human Rights Practices: Democratic People's Republic of Korea*.

15.     More recently, the U.S. Department of State has reported:

Numerous defector accounts and NGO reports described the use of torture by authorities in several detention facilities. Methods of torture and other abuse reportedly included severe beatings; electric shock; prolonged periods of exposure to the elements; humiliations such as public nakedness; confinement for up to several weeks in small "punishment cells" in which prisoners were unable to stand

upright or lie down; being forced to kneel or sit immobilized for long periods; being hung by the wrists; water torture; and being forced to stand up and sit down to the point of collapse, including "pumps," or being forced to repeatedly squat and stand with the person's hands behind their back. Defectors continued to report many prisoners died from torture, disease, starvation, exposure to the elements, or a combination of these causes. Detainees in reeducation through labor camps reported the state forced them to perform difficult physical labor under harsh conditions….

Defectors noted they did not expect many prisoners in political prison camps and the detention system to survive. Detainees and prisoners consistently reported violence and torture. Defectors described witnessing public executions in political prison camps. According to defectors, prisoners received little to no food or medical care in some places of detention. Sanitation was poor, and former labor camp inmates reported they had no changes of clothing during their incarceration and were rarely able to bathe or wash their clothing. The South Korean and international press reported that the kyohwaso re-education camps held populations of up to thousands of political prisoners, economic criminals, and ordinary criminals.

U.S. Department of State Publication, *2018 Country Reports on Human Rights Practices*, available at https://www.state.gov/report/custom/d23bd6e07e/ (last accessed Sept. 6, 2020).

**B.     The Abduction, Torture and Murder of Reverend Kim**

16.     Reverend Kim was born in South Korea in 1947. He graduated Koshin University in Pusan and was ordained as a Presbyterian minister. He was the father of two children from his first marriage and adopted five additional children with his second wife, Plaintiff Young Hwa Chung Kim. Reverend Kim was employed for many years as a minister in South Korea on behalf of the Chicago Evangelical Holiness Church, a Korean-American church located in Illinois.

17.     In 1993 Reverend Kim traveled to China to continue his work as a missionary providing humanitarian and religious services to the families of North Korean defectors and refugees who had fled across the Sino-Korean border seeking asylum.

18. At the time, tens of thousands of North Koreans were living in China after fleeing the dismal humanitarian conditions and political oppression in their homeland. There have been famines, starvation and widespread shortages of basic food supplies in North Korea for decades. Humanitarian conditions and health care in neighboring China are known to be of a much higher standard and many North Korean citizens have risked arrest and imprisonment to escape to China in order to feed themselves and care for their families. They seek to escape the repressive North Korean government.

19. In the Chinese town of Yunji, Reverend Kim set up numerous refugee shelters and a school for expatriate North Korean children and handicapped persons. He named the school "The School of Love."

20. During this period and continuing until today, North Korea and its security agencies took steps to stop the flow of defectors and refugees to China, which were a political embarrassment, sullied its international image and undermined the control of this totalitarian regime over its population. North Korea increased its military patrols along the Chinese border to thwart the defections of its citizens. Moreover, the North Korean security services gathered information against those seeking to defect and carried out pre-emptive arrests and imprisonments. North Korean border guards had and maintain a policy of shooting to kill anyone attempting to escape North Korea for China. In addition, the security services organized squads of agents who crossed into Chinese border towns in order to hunt down North Koreans who had fled. These agents frequently disguised themselves as refugees and infiltrated the shelters and hide-outs of those who had successfully reached China. Once located, the agents abducted the refugees and defectors and forcibly brought them back to North Korea where they were imprisoned in harsh labor camps, tortured, underwent "re-education" programs and in many instances were executed.

The most severe sentences and treatment were inflicted by North Korea on Christian activists and missionaries or those who attempted to make their way to South Korea, North Korea's chief enemy.

21. The North Korean security service learned of Reverend Kim's activities on behalf of the defectors and refugees and decided to abduct him and bring him to North Korea to terminate his work on behalf of those who had escaped.

22. In April 1999, an agent of the North Korean security services, who used the pseudonym "Lee Sun Hee" made Reverend Kim's acquaintance while posing as a defector. For ten months she kept in close contact with Reverend Kim and reported to her superiors in the North Korean security services on his activities as an abduction plan was being organized by her North Korean superiors. According to a later confession of a member of the abduction squad, Kim Hak Ju, who was eventually arrested and prosecuted in South Korea for his role in the kidnapping, undercover operative Lee Sun Hee operated pursuant to instructions from a senior North Korean state security official. This official also was eventually charged by South Korea with abducting defectors and others deemed to be working against the interest of the North Korean government.

23. On January 16, 2000, Lee Sun Hee arranged to meet with Reverend Kim at a restaurant under the pretext of introducing him to two other recent defectors. After eating a meal together and leaving the restaurant, Reverend Kim was suddenly forced inside a taxi by North Korean security agents.

24. As Reverend Kim was violently thrown into the front seat of a taxi, two of the abductors jumped in the back and forced the cabbie to drive off. The taxi drove Reverend Kim out of Yunji city and into the town of Sanhe. The North Korean security agents then transferred him

to another car that transported him to the Sino-Korean border near the crossing on the Tumen River. The abductors then took Reverend Kim across the border to North Korea.

25. Reverend Kim was imprisoned in a labor camp in North Korea for political detainees where he underwent brutal torture by officers, employees and agents of Defendant North Korea.

26. Officers, employees and agents of Defendant North Korea demanded that Reverend Kim renounce his religious beliefs and adopt "Juche," the official political ideology of the North Korean government authored by the Kim regime.

27. When Reverend Kim refused to adopt the Juche ideology he was punished by being deprived of all food by his jailers, who were officers, employees and agents of Defendant North Korea.

28. Reverend Kim died as the result of starvation, physical and psychological abuse and torture inflicted upon him during his imprisonment by officers, employees and agents of Defendant North Korea.

29. Although the exact date and location of Reverend Kim's death are not known, his remains are believed to be in People's Army Camp 91, a North Korean garrison in Sangwon, a suburb on the outskirts of Pyongyang.

30. In 2005, several former North Korean agents residing in South Korea were uncovered and arrested by South Korean law enforcement officials and prosecuted for abducting refugees and defectors who had escaped to China. From these agents' accounts, information concerning Reverend Kim's arrest, torture and murder were provided to human rights organizations and to Plaintiffs. Specifically, Plaintiffs learned that Reverend Kim had been taken

to North Korea and tortured to death by officers, employees and agents of Defendant North Korea acting within their office, employment and agency.

**C.     Prior Judgment**

31.     Reverend Kim's brother, Yong Seok Kim and his oldest son Han Kim brought suit in this Court against Defendant for the damages they suffered as a result of his abduction, torture and killing. On April 9, 2015, the Court found Defendant liable and awarded the Kim plaintiffs a judgment in the amount of $330 million, comprised of $15 million compensatory damages for each plaintiff, and $300 million punitive damages. *Han Kim v. Democratic People's Republic of Korea,* 87 F. Supp. 3d 286 (D.D.C. 2015). *See also* Choe Sang-Hun, New York Times, 2016, "After 15 Years, Legal Victory for Family of Pastor Believed Abducted by North Korea", https://www.nytimes.com/2015/04/16/world/asia/after-15-years-victory-of-sorts-for-family-of-pastor-believed-abducted-by-north-korea.html) (last accessed Sept. 6, 2020).

32.     Plaintiffs in the present action are all other immediate family members of Reverend Kim who were not included in the previous action. They have also suffered great mental and emotional anguish as a result of the Kidnapping and Murder of Reverend Kim.

33.     Plaintiffs are entitled to solatium damages for the injuries to their relatives. *Braun v. Islamic Rep. of Iran*, 228 F. Supp. 3d 64, 78, 82-86 (D.D.C. 2017); *Campuzano*, DE 51, 281 F. Supp. 2d at 273-74; *see also id.* at 276-77 (awarding solatium damages to immediate family members of other victims); *Salzman v. Islamic Republic of Iran*, 2019 U.S. Dist. LEXIS 163632, 2019 WL 4673761 (D.D.C. 2019) (awarding solatium damages to additional family members who had not been plaintiffs in prior lawsuit).

34.     Plaintiffs' claims all plainly arise out of the conduct, transaction, or occurrence that formed the basis of the Prior Judgment.

35. Defendant named herein was the same defendant named in the Prior Judgment. They all received timely and proper notice of the action leading to the Prior Judgment and had a full and fair opportunity to contest liability in that action.

36. Defendant is collaterally estopped by the Prior Judgment from contesting liability in this action.

37. Defendant knew or should have known that the immediate relatives of the plaintiffs in the Prior Judgment had claims against them for loss of solatium.

38. The complaint leading to the Prior Judgment and the litigation that followed fell within the limitations period adequately notified Defendant of the basis for liability that Plaintiffs herein advance in this action.

39. Defendant was subjected to no prejudice by the Prior Judgment and the action leading to it action and are subject to no prejudice by this action.

40. This action is timely. *See Van Beneden v. Al-Sanusi*, 709 F.3d 1165, 1168-69 (D.C. Cir. 2013).

41. This action is not barred by any statute of limitations unless Defendant appears and successfully asserts such an affirmative defense, *see Maalouf v. Islamic Republic of Iran,* 923 F.3d 1095 (D.C. Cir. 2019) (holding FSIA's statute of limitations is an affirmative defense, not a jurisdictional bar, and cannot be raised *sua sponte* by a court).

**D.    Plaintiffs Rely on Evidence Submitted in Support of Prior Judgment**

42. In this action, Plaintiffs will rely on the evidence submitted in support of the Prior Judgment, *Kim v. Democratic People's Republic of Korea,* DDC case number 09-cv-648, including the following docket entries from that case: 16, 17, 18, 19, 20, 22, 23, 24, 26, 29, 30, 31,

32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 50, 54, 55, and all evidence relied upon by the Court in that case.

## FIRST CLAIM FOR RELIEF
## FOR DAMAGES UNDER 28 U.S.C. §1605A(c)

43. The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

44. North Korea was first designated as a state sponsor of terrorism by the State Department in 1988. See Notice, *Determination Pursuant to Section 6(j) of the Export Administration Act of 1979; North Korea*, 53 Fed. Reg. 3477-01 (Feb. 5, 1988). The State Department rescinded that determination in 2008. Notice, *Rescission of Determination Regarding North Korea*, 73 Fed. Reg. 63540-01 (Oct. 24, 2008). The State Department re-designated North Korea as a state sponsor of terrorism in November 2017, and that designation has not been rescinded. *See* Notice, *Democratic People's Republic of Korea (DPRK) Designation as a State Sponsor of Terrorism (SST)*, 82 Fed. Reg. 56100-01 (Nov. 27, 2017). North Korea thus either "remains so designated" 28 U.S.C. § 1605A(a)(2)(A)(i)(I), *see Warmbier v. Democratic People's Republic of Korea,* 356 F. Supp. 3d 30, 44 (D.D.C. 2018) or "was so designated within the 6-month period before the claim is filed." 28 U.S.C. § 1605A(a)(2)(A)(i)(I).

45. Defendant North Korea, through its officials, employees and agents intentionally ordered, directed and caused the torture and murder of Reverend Kim.

46. Defendants' treatment of Reverend Kim constituted torture within the meaning of 28 U.S.C. § 1605A.

47. Defendants' murder of Reverend Kim constituted an extrajudicial killing within the meaning of 28 U.S.C. § 1605A.

48. The abduction, torture and murder of Reverend Kim by Defendant caused his daughter, Plaintiff Dani Butler, severe harm, including the loss of her father's society, companionship, comfort, advice and counsel and severe mental anguish, extreme emotional distress and solatium damages

49. The abduction, torture and murder of Reverend Kim by Defendant caused his wife, Plaintiff Young Hwa Chung Kim, severe harm, including the loss of her husband's society, companionship, comfort, advice and counsel and severe mental anguish, extreme emotional distress and solatium damages.

50. The abduction, torture and murder of Reverend Kim by Defendant caused his son, Plaintiff Chun Kook Kim, severe harm, including the loss of his father's society, companionship, comfort, advice and counsel and severe mental anguish, extreme emotional distress and solatium damages.

51. The abduction, torture and murder of Reverend Kim by Defendant caused Plaintiffs severe injury, including: pecuniary loss and loss of income; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium.

52. Plaintiffs are all U.S. citizens or U.S. nationals.

53. As a direct and proximate result of the conduct of Defendant, Plaintiffs suffered the injuries and harm described herein.

54. Defendant is therefore liable under 28 USC 1605A(c) for the full amount of Plaintiffs' damages.

55. The conduct of Defendant was criminal, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages under 28 U.S.C. § 1605A(c).

## SECOND CLAIM FOR RELIEF
## FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## PURSUANT TO VIRGINIA, MISSOURI AND ILLINOIS OR OTHER
## APPLICABLE LAW

56. The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

57. Defendant subjected Reverend Kim to abduction, kidnapping, severe physical injury, and murder.

58. Defendant's conduct was willful, outrageous and dangerous to human life, and violates applicable criminal law, all international standards of civilized human conduct and common decency.

59. Upon learning of the Kidnapping and Murder, Plaintiffs suffered severe emotional distress in worrying about their family member Reverend Kim and/or not knowing his condition or whereabouts.

60. Defendant intended to, and did in fact, terrorize Plaintiffs, and cause them egregious emotional distress. As a result and by reason of the Kidnapping and Murder, which was caused by the actions of Defendant described herein, Plaintiffs have suffered and will continue to suffer terror, severe mental anguish, bereavement and grief, and injury to their feelings.

61. Defendant is liable for the full amount of Plaintiffs' damages. *See Campuzano*, 281 F. Supp. 2d at 271, 276-77 (holding the defendants liable under intentional infliction of emotional distress to relatives of other victims who, like Plaintiffs here, were not present at the Terrorist Attack).

62. The conduct of Defendant was criminal, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages.

## THIRD CLAIM FOR RELIEF
## FOR LOSS OF CONSORTIUM PURSUANT TO VIRGINIA, MISSOURI AND ILLINOIS OR OTHER APPLICABLE LAW

63. The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

64. At all relevant times, Plaintiffs Young Hwa Chung Kim, Dani Butler and Chun Kook Kim were, respectively, the wife and children of Reverend Kim.

65. As a result of the abduction, torture and murder of Reverend Kim by Defendant Plaintiffs were deprived of the services, society and solatium of their husband and father and suffered severe mental anguish, bereavement and grief, and injury to their feelings.

66. By reason of the foregoing, Plaintiffs are entitled to recover the full extent of their damages.

67. Defendant's conduct was outrageous in the extreme, wanton, willful and malicious, and constitutes a threat to the public at large. Plaintiffs are therefore entitled to an award of punitive damages against Defendant in an amount to be determined at trial

## JURY DEMAND

Plaintiffs demand trial by jury of all issues legally triable to a jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment as follows:

(a) Judgment against Defendant for compensatory damages in an amount to be determined at trial;

(b) Judgment against Defendant, for punitive damages in an amount to be determined at trial;

(c) Plaintiffs' costs and expenses;

  (d)  Plaintiffs' attorneys fees;

  (e)  Pre-judgment and post-judgment interest; and

  (f)  Such other and further relief as the Court finds just and equitable.

Dated: September 8, 2020
   Brooklyn, New York

               Respectfully submitted,

               THE BERKMAN LAW OFFICE, LLC
               *Counsel for Plaintiffs*

               By: _____
                 Robert J. Tolchin
                 (D.C. Bar #NY0088)

               111 Livingston Street, Suite 1928
               Brooklyn, New York 11201
               (718) 855-3627
               rtolchin@berkmanlaw.com

               NITSANA DARSHAN-LEITNER & CO.
               Nitsana Darshan-Leitner[*]
               *(International Counsel for Plaintiffs)*
               11 Havatikim Street
               Petah Tikva, 49389
               Israel
               +972 523513953
               nitsanaleitner@gmail.com

---

[*] Member of the Israeli Bar