# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

-------------------------------------------------------------------- X

DANI BUTLER, *et al.,*

                  Plaintiffs,

           -against-

DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA*,*

                  Defendant.

Docket No: 20-cv-2514 (ACR)

-------------------------------------------------------------------- X

---

## PLAINTIFFS' MEMORANDUM OF LAW IN
## SUPPORT OF MOTION FOR JUDGMENT BY DEFAULT

---

# THE BERKMAN LAW OFFICE, LLC

*Attorneys for Plaintiffs*

829 East 15th Street, Box 7

Brooklyn, New York 11230

718-855-3627

## **Table of Contents**

TABLE OF AUTHORITIES ................................................................................................. *ii*

I.      INTRODUCTION ..................................................................................................1

II.     SERVICE OF PROCESS .......................................................................................2

III.    STANDARD FOR DEFAULT JUDGMENTS UNDER THE FSIA ...............................4

        A.      Personal Jurisdiction ...............................................................................5

        B.      Subject Matter Jurisdiction ......................................................................5

        C.      Satisfactory Evidence to Establish Plaintiffs' Claims and Damages.....................10

        D.      Plaintiffs Are Eligible for a Damages Award .........................................13

IV.     PROPOSED SOLATIUM DAMAGES AWARDS ....................................................16

V.      PROPOSED PUNITIVE DAMAGES .....................................................................16

VI.     THE STATUTE OF LIMITATIONS DOES NOT BAR THIS ACTION ........................28

CONCLUSION.........................................................................................................35

## **Table of Authorities**

**Cases**

*Acosta v. Islamic Rep. of Iran*, 574 F. Supp. 2d 15 (D.D.C. 2008) ...................................14, 27, 28

*Alejandre v. Rep. of Cuba*, 996 F. 1239 (S.D. Fla. 1997)..............................................................10

*Anderson v. Islamic Rep. of Iran*, 753 F. Supp. 2d 68 (D.D.C. 2010)...........................................15

*Anderson v. Islamic Rep. of Iran*, 90 F. Supp. 2d 107 (D.D.C. 2001)...........................................19

*Antoine v. Atlas Turner, Inc.*, 66 F.3d 105(6th Cir. 1995).............................................................11

*Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48 (D.D.C. 2011)...........................................................................................................................................27, 28

*Beer v. Islamic Rep. of Iran*, 798 F. Supp. 2d 14 (D.D.C. 2011)...................................................28

*Bennett v. Islamic Rep. of Iran*, 507 F. Supp. 2d 117 (D.D.C. 2007)...........................................11

*Bodoff v. Islamic Rep. of Iran*, 907 F. Supp. 2d 93 (D.D.C. 2012) ..............................................27

*Braun v. Islamic Rep. of Iran*, 228 F. Supp. 3d 64 (D.D.C. 2017) .....................................4, 10, 13

*Brayton v. U.S. Trade Rep.*, 641 F. Supp. 3d 521 (D.C. Cir. 2011) ..............................................14

*Brewer v. Islamic Rep. of Iran*, 664 F. Supp. 2d 43 (D.D.C. 2009) ...........................................5, 6

*Bundy v. Jackson*, 641 F.2d 934 (D.C. Cir. 1981) ........................................................................10

*Campuzano v. Islamic Rep. of Iran*, 281 F. Supp. 2d 258 (D.D.C. 2003) ....................................11

*Cicippio v. Islamic Rep. of Iran*, 18 F. Supp. 2d 62 (D.D.C. 1998) .............................................17

*Cohen v. Iran*, 268 F. Supp. 3d 19 (D.D.C. 2017)........................................................................14

*Cohen v. Islamic Rep. of Iran*, 238 F. Supp. 3d 71 (D.D.C. 2017)................................................4

*Commercial Bank of Kuwait v. Rafidain Banks*, 15 F.3d 238(2d Cir. 1994)................................11

*Edmond v. U.S. Postal Serv. Gen. Counsel*, 949 F. Supp. 2d 415 (D.C. Cir. 1991).................4, 5

*Elahi v. Islamic Rep. of Iran*, 124 F. Supp. 2d 97 (D.D.C. 2000)................................................10

*Estate of Botvin v. Islamic Rep. of Iran*, 510 F. Supp. 2d 101 (D.D.C. 2007)............................10

*Fain v. Islamic Rep. of Iran*, 856 F. Supp. 2d 109 (D.D.C. 2012) ..........................................12, 16

*Flatow v. Islamic Rep. of Iran*, 999 F. Supp. 1 (D.D.C. 1998)...............................................10, 13

*Fraenkel v. Islamic Rep. of Iran*, 892 F. Supp. 3d 348 (D.C. Cir. 2018)........................................13

*Gates v. Syrian Arab Rep.*, 580 F. Supp. 2d 53 (D.D.C. 2008) ................................................10, 28

*Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044 (2014) ..................... *passim*

*Han Kim v. Democratic People's Republic of Korea,* 87 F. Supp. 3d 286
(D.D.C. 2015) .........................................................................................1, 8, 15, 22, 23, 28

*Han Kim v. Democratic People's Republic of Korea,* 950 F. Supp. 2d 29 (D.D.C.
2013)...................................................................................................................1, 8, 15

*Hekmati v. Iran*, 278 F. Supp. 3d 145 (D.D.C. 2017)...................................................................14

*Higgins v. Islamic Rep. of Iran*, 2000 WL 33674311 (D.D.C. 2000) ...........................................17

*Hill v. Iraq*, 328 F.3d 680 (D.C. Cir. 2003) .................................................................................10

*Hutira v. Islamic Rep. of Iran*, 211 F. Supp. 2d 115 (D.D.C. 2002) ...........................................11

*Int'l Road Fed'n v. Democratic Rep. of the Congo*, 131 F. Supp. 2d 248 (D.D.C.
2001)...............................................................................................................................

*James Madison Ltd by Hecht v. Ludwig*, 82 F. Supp. 3d 1085 (D.C. Cir. 1996) ...........................4

*Maalouf v. Islamic Republic of Iran*, 440 U.S. App. D.C. 451 (2019) ........................................29

*Mohammadi v. Islamic Rep. of Iran*, 782 F. Supp. 3d 9 (D.C. Cir. 2015)......................................6

*Moradi v. Iran*, 77 F. Supp. 3d 57 (D.D.C. 2015) ......................................................................14

*Murphy v. Islamic Rep. of Iran,* 740 F. Supp. 2d 51 (D.D.C. 2010) ...........................................12

*Mwani v. Bin Laden*, 417 F.3d 1 (D.C. Cir. 2005)........................................................................4

*Oveissi v. Islamic Rep. of Iran*, 498 F. Supp. 2d 268 (D.D.C. 2007) ...........................................11

*Owens v. Rep. of Sudan*, 864 F.3d 751 (D.C. Cir. 2017)..............................................................28

*Polhill v. Islamic Rep. of Iran*, 2001 WL 34157501 (D.D.C. 2001)..............................................18

*Reed v. Islamic Rep. of Iran*, 845 F. Supp. 2d 204(D.D.C. 2012) ..............................................14

*Rimkus v. Islamic Rep. of Iran*, 750 F. Supp. 2d 163 (D.D.C. 2010) .....................................10, 12

*Roth v. Islamic Rep. of Iran*, 78 F. Supp. 3d 379(D.D.C. 2015) .............................................10, 13

*Salazar v. Islamic Rep. of Iran*, 370 F. Supp. 2d 105 (D.D.C. 2005) ..........................................13

*Saludes v. Republica de Cuba*, 577 F. Supp. 2d 1243 (S.D. Fla. 2008) .....................................8, 15

*Stansell v. Republic of Cuba,* 217 F. Supp. 3d 320 (D.D.C. 2016) ...............................14

*Steen v. Islamic Rep. of Iran*, 2003 WL 21672820 (2003) .....................................19

*Surette v. Islamic Rep. of Iran,* 231 F. Supp. 2d 260 (D.D.C. 2002).........................18

*Sutherland v. Islamic Rep. of Iran*, 151 F. Supp. 2d 27 (D.D.C. 2001).....................19

*Turley v. ISG Lackawanna*, 774 F. 3d 140 (2d Cir. 2014)......................................14

*Valore v. Islamic Rep. of Iran*, 700 F. Supp. 2d 52 (D.D.C. 2010) ..........................28

*Wachsman v. Islamic Rep. of Iran*, 603 F. Supp. 2d 148 (D.D.C. 2009)...................11

*Warmbier v. Democratic People's Republic of Korea,* 356 F. Supp. 3d 30 (D.D.C. 2018) ...................................................................................................................7

*Weinstein v. Islamic Rep. of Iran*, 175 F. Supp. 2d 13 (D.D.C. 2001) .......................11

*Weinstein v. Islamic Rep. of Iran*, 184 F. Supp. 2d 13, 19 (D.D.C. 2002) .................11

*Worley v. Islamic Rep. of Iran*, 75 F. Supp. 3d 311 (D.D.C. 2014)...........................10

*Wultz v. Islamic Rep. of Iran*, 864 F. Supp. 2d 24 (D.D.C. 2012) .............................27

*Wyatt v. Syrian Arab Republic,* 908 F. Supp. 2d 216 (D.D.C. 2012) ..........................28

## **Statutes and Rules**

8 U.S.C. § 1101(a)(22)...........................................................................................6, 7

28 U.S.C. § 1605A ............................................................................ *passim*

28 U.S.C. § 1330...................................................................................................5

28 U.S.C. § 1602...................................................................................................1

28 U.S.C. § 1604...................................................................................................4

28 U.S.C. § 1608...............................................................................................2, 3, 5

Fed. R. Civ. P. 4(j)(1) ..........................................................................................5

Fed. R. Civ. P. 55(d) ..........................................................................................10

**<u>Other Authority</u>**

Notice, Democratic People's Republic of Korea (DPRK) Designation as a State
Sponsor of Terrorism (SST), 82 Fed. Reg. 56100-01 ...................................................6

Notice, Determination Pursuant to Section 6(j) of the Export Administration Act
of 1979; North Korea, 53 Fed. Reg. 3477-01 (Feb. 5, 1988)......................................5

Notice, Rescission of Determination Regarding North Korea, 73 Fed. Reg. 63540-
01 (Oct. 24, 2008)........................................................................................................6

Restatement (Second) of Torts § 908(1) (1977) ..........................................................27

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION
FOR JUDGMENT BY DEFAULT**

Plaintiffs respectfully submit this Memorandum in support of their Motion for Default Judgment against Defendant The Democratic People's Republic of Korea ("North Korea") pursuant to 28 U.S.C. § 1608(e).

**I.**

**INTRODUCTION**

This is a civil action brought pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602, *et seq*. Plaintiffs are the widow and children of Reverend Dong Shik Kim, who was kidnapped, tortured, and murdered by the North Korean regime in 2000.

The kidnapping, torture, and murder of Reverend Kim have already been before this court in of *Kim v. Democratic People's Republic of Korea,* D.D.C. case no. 09-cv-00648 (RWR) *(Kim)*. That action resulted in an initial order of the district court, *Han Kim v. Democratic People's Republic of Korea,* 950 F. Supp. 2d 29 (D.D.C. 2013) *(Kim I),* an appeal to the of United States Court of Appeals for the District of Columbia Circuit in *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044 (2014) *(Kim II)*, and an opinion on remand granting final judgment to the plaintiffs in that case, *Han Kim v. Democratic People's Republic of Korea,* 87 F. Supp. 3d 286 (D.D.C. 2015) *(Kim III)*. A copy of the D.C. Circuit's decision *Kim II* is submitted herewith as Ex. S to the declaration of Robert J. Tolchin in support of this motion (Dkt. 24[1]), and a copy of the district court's opinion and final order, *Kim III,* are submitted herewith as Ex. T and U to that declaration.

---

[1] Parenthetical references to "Dkt." refer to the docket in this case. References to the docket in *Wyatt I* are identified separately.

The plaintiffs in *Kim* were the brother and son of Reverend Kim.  An award was made in that case to both plaintiffs for solatium damages in the amount of $15 million each, and a collective award of punitive damages in the amount of $300 million.

In this case, Plaintiffs are the widow and children of Reverend Kim, whose claims were not presented in the earlier action.  They seek comparable damages awards.

## II.

## SERVICE OF PROCESS

On September 8, 2020, Plaintiffs filed a Complaint against North Korea seeking damages pursuant to 28 U.S.C. § 1605A for the kidnapping, torture, and murder of Reverend Kim at issue in this case.

Service upon North Korea was first attempted on October 19, 2020 Plaintiffs requested that the Clerk mail service of process on Defendant Democratic People's Republic of Korea ("North Korea") by registered mail.  (Dkt. 6).  On October 26, 2020 the Clerk docketed an unnumbered notice that the "Clerk's Office is unable to effect service via the U.S. Post Office." After some discussion with the Clerk, another request was filed on November 18, 2020 (Dkt. 7), with a document submitted by mail which was docketed December 7, 2020 (Dkt. 8).  On December 7, 2020, the Clerk docketed a certificate of service by first class mail (Dkt. 9).  For a period it went overlooked by Plaintiffs' counsel that the requested service was for registered mail but the Clerk had served by first class, non-registered mail.  On June 1, 2021, the Clerk advised Plaintiffs' counsel by telephone that because of the COVID-19 pandemic the Clerk was not making trips to the Post Office, and therefore the Clerk was not then able to effectuate service of process using registered mail.

Since service by registered mail, as permitted by 28 U.S.C. § 1608(a)(3) was thus not possible at that time, Plaintiffs progressed to the next option, service by diplomatic service, as permitted by § 1608(a)(4), when service by mail "cannot be made," *id.*

On June 9, 2021 a request for service by diplomatic means was docketed (Dkt. 10), and related documents sent to the Clerk in paper form were docketed by the Clerk on June 22, 2021 (Dkt. 11). Also on June 22, 2021 the Clerk docketed a Certificate of Clerk indicating that the requisite documents were served on the U.S. Department of State for diplomatic service (Dkt. 12).

Diplomatic service was not a simple matter. On November 16, 2022, the undersigned reached out to the U.S. Department of State and was advised that the U.S. Department of State did receive the request for diplomatic service of process, that the delay in the diplomatic service of process involved questions about how to go about serving the defendant, and that two attorneys with the U.S. Department of State that work on FSIA cases were reviewing the request, along with requests for two other cases pending in this Court against the same defendant. On June 7, 2023 the undersigned received a status update letter from the State Department saying that because the US does not have diplomatic relations with North Korea the State Department lacked a present means of carrying out diplomatic service, though "[t]he Department continues to explore options to facilitate the service of process on the DPRK consistent with the provisions of the Foreign Sovereign Immunities Act." (Dkt. 18-1)

On April 19, 2024 the Clerk docketed a letter dated April 10, 2024 from the State Department Office of the Legal Advisor stating that diplomatic service had been carried out on February 12, 2024, along with the relevant diplomatic note (Dkt. 19).

Pursuant to 28 U.S.C. § 1608(d), a foreign country has 60 days from the date of service to answer a complaint. Since service was carried out on February 12, 2024, Defendant North Korea

was required to answer by April 12, 2024.  That date has passed and Defendant North Korea has

not appeared or otherwise responded to the complaint, and is therefore now in default.

On March 27, 2025 Plaintiffs filed a request that the Clerk enter the default of North Korea.

(Dkt. 21).  The Clerk noted the default on March 28, 2025 (Dkt. 22).

Accordingly, North Korea has been properly served and is now in default.

## III.

### STANDARD FOR DEFAULT JUDGMENTS UNDER THE FSIA

Entry of default judgments in FSIA terrorism cases is not automatic.  *Mwani v. Bin Laden*,

417 F.3d 1, 6 (D.C. Cir. 2005); *Braun v. Islamic Rep. of Iran*, 228 F. Supp. 3d 64 (D.D.C. 2017);

*James Madison Ltd by Hecht v. Ludwig*, 82 F. Supp. 3d 1085, 1092 (D.C. Cir. 1996); *Edmond v.*

*U.S. Postal Serv. Gen.  Counsel*, 949 F. Supp. 2d 415, 424 (D.C. Cir. 1991).  Foreign sovereigns

are generally immune from suit in U.S. courts.  28 U.S.C. § 1604.  The FSIA, however, provides

narrow exceptions to this general rule.  When the requirements of one of these exceptions is met

and the foreign state is properly served, the FSIA waives sovereign immunity and provides both

subject-matter jurisdiction over the action and personal jurisdiction over the foreign state.  28

U.S.C. § 1604; *Cohen v. Islamic Rep. of Iran*, 238 F. Supp. 3d 71, 80 (D.D.C. 2017); *Braun*, 228

F. Supp. 3d at 74.

As such, in an FSIA case, a default judgment may only be entered when the Court is

satisfied that (1) it has subject matter jurisdiction over the claims, (2) personal jurisdiction is

properly exercised over the defendants, (3) the plaintiffs have presented satisfactory evidence to

establish their claims against the defendants, and (4) the plaintiffs have satisfactorily proven that

they are entitled to the monetary damages they seek. *Id.*  at 74.

Plaintiffs have satisfied all four requirements sufficient to establish their claims as well as their damages against the defendants, thereby entitling them to a default judgment.

## A.     Personal Jurisdiction

While plaintiffs have the burden of proving personal jurisdiction, they "can satisfy that burden with a *prima facie* showing." *Edmond*, 949 F. Supp. 2d at 424.  In doing so, they can rely upon their pleadings, affidavits and other written materials they can obtain.  *Id*.

Federal statute grants district courts personal jurisdiction over foreign states wherever "service has been made under section 1608 of [Title 28]." 28 U.S.C. § 1330(a); *see also* Fed. R. Civ. P. 4(j)(1).  Section 1608(a) prescribes several alternative methods to serve a foreign state in decreasing order of preference.  § 1608(a); *see generally Brewer v. Islamic Rep. of Iran*, 664 F. Supp. 2d 43, 50-51 (D.D.C. 2009) (discussing service of process under § 1608 in an FSIA terrorism case against a foreign state).

Service on North Korea under § 1608(a)(1) and (a)(2) is impossible because no pertinent "special arrangement" exists with Syria and no "international convention" is applicable as to North Korea.  Plaintiffs complied with the requirements of § 1608(a)(4) by serving North Korea with copies of the Summons, Complaint, and Notice of Suit, along with a translation of each in Arabic by diplomatic service, where mail service was not available.

## B.     Subject Matter Jurisdiction

In 2008 Congress enacted a comprehensive terrorism exception to the FSIA that waived a foreign state's sovereign immunity and provided terrorism victims with a cause of action in cases involving certain types of state sponsored terrorism.  *See Brewer*, 664 F. Supp. 2d 43, 51.  This terrorism exception is now codified as 28 U.S.C. § 1605A and has previously been applied to North Korea where numerous courts have found those countries have supported terrorist attacks

that harmed American nationals. *See, e.g. Kim*; *Warmbier v. Democratic People's Republic of Korea,* DDC case no. 18-cv-977 (BAH) ("*Warmbier*").

Specifically, the terrorism exception, covering claims against designated state sponsors of terrorism-provides that:

> A foreign state shall not be immune…[when] money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing…or the provision of material support or resources for such an act if…engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1); *Brewer,* 664 F. Supp. 2d at 50*; Mohammadi v. Islamic Rep. of Iran*, 782 F. Supp. 3d 9, 13 (D.C. Cir. 2015).

The FSIA also creates a "private right of action" for U.S. nationals.[2] 28 U.S.C. § 1605A(c). In actions brought under § 1605A(c), American nationals harmed by state-sponsored terrorism may seek "money damages" including economic damages, solatium, pain and suffering, and punitive damages. *Id*.

First, North Korea was first designated as a state sponsor of terrorism by the State Department in 1988. *See* Notice, Determination Pursuant to Section 6(j) of the Export Administration Act of 1979; North Korea, 53 Fed. Reg. 3477-01 (Feb. 5, 1988). The State Department rescinded that determination in 2008. Notice, Rescission of Determination Regarding North Korea, 73 Fed. Reg. 63540-01 (Oct. 24, 2008). The State Department re-designated North Korea as a state sponsor of terrorism in November 2017, and that designation has not been rescinded. *See* Notice, Democratic People's Republic of Korea (DPRK) Designation as a State Sponsor of Terrorism (SST), 82 Fed. Reg. 56100-01 (Nov. 27, 2017). North Korea thus either

---

[2] "National" is defined as "the meaning given that term in section 101(a)(22) of the Immigration and Nationality Act (8 U.S.C. § 1101(a)(22))" 28 U.S.C. § 1605A(h)(5).

"remains so designated" 28 U.S.C. § 1605A(a)(2)(A)(i)(I), *see Warmbier v. Democratic People's Republic of Korea,* 356 F. Supp. 3d 30, 44 (D.D.C. 2018) or "was so designated within the 6-month period before the claim is filed." 28 U.S.C. § 1605A(a)(2)(A)(i)(I).

Second, each Plaintiff satisfied 28 U.S.C. § 1605A(a)(2)(A)(ii)(I) as they were a "national of the United States" at the time of Reverend Kim's abduction, and continue to be a "national of the United States" through the present day, which is relevant because North Korea's refusal to return Reverend Kim's body means that the "act…occurred," § 1605A(a)(2)(A)(ii) in the past as well as now.

The term "national of the United States" is defined for purposes of § 1605A(a)(2)(A)(ii)(I) in § 1605A(h)(5) by reference to the definition contained in the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(22), which provides: "The term 'national of the United States' means (A) a citizen of the United States, or (B) a person who, though not a citizen of the United States, owes permanent allegiance to the United States." *Id.*

Copies of the U.S. passports of each of the Plaintiffs are filed herein under seal as Dkt. 23. These passports demonstrate Plaintiffs' present status as United States citizens.

The declarations of each of the Plaintiffs establish that at the time of Reverend Kim's abduction each of the plaintiffs was a legal permanent resident ("green card") of the United States for years, and later became a United States citizen.  (Chun Kook Kim decl., ¶ 4; Dani Butler Decl. ¶ 4; Young Hwa Chung Kim decl., ¶ 6).  Having become a permanent resident of the United States years before Reverend Kim's abduction, and later following that up by applying for and obtaining United States citizenship, each of the demonstrated that he owed a permanent allegiance to the U.S. An individual deemed to "owe[] a permanent allegiance to the United States" and who actively pursues U.S. citizenship can be held to be a "national of the United States" in satisfaction

of § 1605A(a)(2)(A)(ii)(I).  This was the holding in *Saludes v. Republica de Cuba*, 577 F. Supp.

2d 1243 (S.D. Fla. 2008), which reasoned:

> Because Plaintiff Olivia Saludes has resided in the United States since 2000,
> applied for United States citizenship in June of 2007, and sworn that she has owed
> allegiance to the United States since 2000, I conclude that Plaintiff Olivia Saludes
> has demonstrated that she owes permanent allegiance to the United States.  As such,
> Plaintiff Olivia Saludes is currently a national of the United States as defined in
> section 101(a)(22) of the Immigration and Nationality Act.  In addition, based on
> the length of time that she had resided in the United States, the statements in her
> affidavit, and her subsequent application for United States citizenship as soon as
> the seven-year statutory period had been fulfilled, I further conclude that Plaintiff
> Olivia Saludes was a national of the United States in 2003 at the time of her son's
> arrest and initial detention.

*Saludes*, 577 F. Supp. 2d at 1252.  Further, this was the holding of the *Kim* court:

> An individual deemed to owe a permanent allegiance to the United States and who
> actively pursues U.S. citizenship can be held to be a "national of the United States"
> in satisfaction of § 1605A(a)(2)(A)(ii)(I).  *See, e.g., Saludes v. Republica de Cuba*,
> 577 F. Supp. 2d 1243, 1252 (S.D.  Fla.  2008).  At the time of Reverend Kim's
> abduction, plaintiff Yong Kim was a U.S. citizen and plaintiff Han Kim can be
> deemed to have been a U.S. national.  He had lived in the U.S. since 1992 and
> became a Permanent Resident owing a permanent allegiance to the U.S. In 1999,
> before his father's abduction, he began the application process to become a
> naturalized American citizen with the intention of remaining in this country.

*Kim I*, 950 F. Supp. 2d at 41; *and see Kim III*, 87 F. Supp. 3d at 289 ("When Reverend Kim was

abducted in 2000, Han Kim was a permanent resident of the United States, and later became a U.S.

citizen in 2003.)

The requirements of § 1605A(a)(2)(A)(ii)(I) are also met here because the offending acts

of North Korea are ongoing until today.  The Kim family has never received any word of Reverend

Kim's whereabouts, and the evidence shows that Reverend Kim's remains remain in the custody

of the Defendant.  Defendant North Korea's ongoing failure to return Reverend Kim's body to the

family members and concomitant invasion of their right of sepulture is a continuation of the

kidnapping that continues to this day. The D.C. Circuit recognized this aspect of the claims regarding Reverend Kim, quoting favorably a decision of the Inter-American Court of Human Rights, "this type of repression is characterized by an attempt to suppress all information about the kidnapping or the whereabouts and fate of the victim. *Velásquez-Rodriguez v. Honduras*, Merits, Judgment, Inter-Am. Ct. H.R. (ser. C) No. 4, ¶ 131 (July 29, 1988)," *Kim,* 774 F.3d 1044, 1049. Thus, Plaintiffs were and are US Citizens "at the time the act described in [28 U.S.C. § 1605A(a)](1) occurred," 28 U.S.C. § 1605(a)(2)(A)(ii)(I), and their claims fall within the statute. Even though they were not US citizens at the time of the kidnapping itself, and likely not even at the time that Reverend Kim was physically tortured murdered, they became citizens in 2004 and 2007 and were citizens when this action was filed and today, which is significant because of the ongoing nature of Defendant North Korea's actions towards Reverend Kim and his family members, the Plaintiffs.

Third, Defendant North Korea's actions have already been held by the D.C. Circuit in *Kim II,* 774 F.3d 1044 to constitute "torture" within the meaning of § 1605A.

Fourth, as required by § 1605A(a)(1) and (c), Plaintiffs' claims arise from a personal injury. The damages they may seek include "economic damages, solatium, pain and suffering, and punitive damages." § 1605A(c). Defendant North Korea's failure to return the body of Reverend Kim, thus depriving the family of their right of sepulture, and to acknowledge what it did to Reverend Kim, is certainly a form of solatium and pain and suffering damages.

Therefore, this Court has jurisdiction over, and Defendants are not immune from, this action.

## C.    Satisfactory Evidence to Establish Plaintiffs' Claims and Damages

The FSIA requires that a default judgment against a foreign state be entered only after a plaintiff "establishes his claim or right to relief by evidence that is satisfactory to the Court." 28 U.S.C. § 1608(e).  This has been interpreted to impose the same standard for entry of default judgments against the U.S. government as set forth in Fed. R. Civ. P. 55(d) (previously Rule 55(e)). While the "FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide, requiring only that it be 'satisfactory to the court,'" courts must be mindful that Congress enacted § 1605A, FSIA with the "aim[] to prevent state sponsors of terrorism-entities particularly unlikely to submit to this country's laws-from escaping liability for their sins." *Kim II*, 774 F.3d at 1047-48 (quoting 28 U.S.C. 1608(e)).  With this objective in mind, the D.C. Circuit has instructed that "courts have the authority-indeed, we think, the obligation, to 'adjust [evidentiary requirements] to…differing situations.'" *Braun*, 228 F. Supp. 3d at 64 (quoting *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981)); *Hill v. Iraq*, 328 F.3d 680, 684-85 (D.C. Cir. 2003).

Therefore, although the Court may not simply accept a complaint's unsupported allegations as true, it may-and perhaps must, *see Hill*, 328 F. Supp. 3d at 684-85, "rely upon unconverted factual allegations that are supported by affidavits." *Worley v. Islamic Rep. of Iran*, 75 F. Supp. 3d 311, 319 (D.D.C. 2014); *Braun*, 228 F. Supp. 3d at 64; *Roth v. Islamic Rep. of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015) ("Courts may rely on uncontroverted factual allegations that are supported by affidavits.") (citing *Rimkus v. Islamic Rep. of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010)); *Gates v. Syrian Arab Rep.*, 580 F. Supp. 2d 53, 63 (D.D.C. 2008) (quoting *Estate of Botvin v. Islamic Rep. of Iran*, 510 F. Supp. 2d 101, 103 (D.D.C. 2007)) aff'd, 646 F.3d 1 (D.D.C. 2011); *Elahi v. Islamic Rep. of Iran*, 124 F. Supp. 2d 97, 100 (D.D.C. 2000) (citing *Alejandre v. Rep. of Cuba*, 996 F. 1239, 1243 (S.D. Fla. 1997)), *see also Flatow v. Islamic Rep. of Iran*, 999 F. Supp.

1 (D.D.C. 1998). Plaintiffs are therefore entitled to establish their proof in FSIA default judgment proceedings via affidavits and expert reports. *Wachsman v. Islamic Rep. of Iran*, 603 F. Supp. 2d 148 (D.D.C. 2009), *Campuzano v. Islamic Rep. of Iran*, 281 F. Supp. 2d 258, 268 (D.D.C. 2003).

Plaintiffs note that the FSIA does not require evidentiary hearings or explicit findings "where the record shows that the plaintiffs provided sufficient evidence in support in support of its claims." *Commercial Bank of Kuwait v. Rafidain Banks*, 15 F.3d 238, 242 (2d Cir. 1994); *see also Kim II*, 774 F. 3d at 1051 (relying on affidavits in reversing and remanding for District Court to enter a default judgment without an evidentiary hearing); *Antoine v. Atlas Turner, Inc.*, 66 F.3d 105, 111 (6th Cir. 1995) ("Use of affidavits in granting default judgments does not violate either due process or the FSIA"). A plaintiff may establish his or her proof in FSIA default judgment proceedings via affidavit, and live testimony is not required. *See e.g. Weinstein v. Islamic Rep. of Iran*, 175 F. Supp. 2d 13, 17 (D.D.C. 2001); *Campuzano,* 281 F. Supp. 2d at 268; *Oveissi v. Islamic Rep. of Iran*, 498 F .Supp. 2d 268, 272 (D.D.C. 2007); *Bennett v. Islamic Rep. of Iran*, 507 F. Supp. 2d 117, 125 (D.D.C. 2007; *Weinstein v. Islamic Rep. of Iran*, 184 F. Supp. 2d 13, 19 (D.D.C. 2002); *Hutira v. Islamic Rep. of Iran*, 211 F. Supp. 2d 115 (D.D.C. 2002); *Elahi*, 124 F. Supp. 2d at 100; *Int'l Road Fed'n v. Democratic Rep. of the Congo*, 131 F. Supp. 2d 248, 252 (D.D.C. 2001); *Commercial Bank of Kuwait,* 15 F.3d at 242.

Plaintiffs are seeking damages for loss of solatium, their injuries stem from the same events at issue in *Kim*, and their claims present the same essential questions posed in *Kim*. The D.C. Circuit' opinion in *Kim* made extensive findings of fact regarding the kidnapping, torture and death of Reverend Kim.

While the holdings in *Kim* are not binding on this Court as collateral estoppel, *see Weinstein*, 175 F. Supp. 2d at 17-19 (explaining why offensive collateral estoppel does not apply

to default judgments entered under the terrorism exception to the FSIA), prior decisions in this district "have…frequently taken judicial notice of earlier, related proceedings," *Rimkus,* 750 F. Supp. 2d at 171 (Lamberth, *J.*).  But that does not mean that the Court should simply accept the facts found in the earlier opinion, which would amount to an exercise of collateral estoppel.  The Court may, however, "review evidence considered in" the prior proceeding "without necessitating the re-presentment of such evidence." *Murphy v. Islamic Rep. of Iran,* 740 F. Supp. 2d 51, 59 (D.D.C. 2010) (Lamberth, *J.*).  This Court has held:

> "mindful that the statutory obligation found in § 1608(e) was not designed to impose the onerous burden of re-litigating key facts in related cases arising out of the same terrorist attack," 750 F. Supp. 2d at 163 (*citing Brewer*, 664 F. Supp. 2d at 54)—determined that the proper approach is one "that permits courts in subsequent related cases to rely upon the evidence presented in earlier litigation…without necessitating the formality of having that evidence reproduced." *Id.  (citing Murphy*, 740 F. Supp. 2d at 58).  Thus, based on judicial notice of the evidence presented in the earlier cases…courts may reach their own independent findings of fact.

*Fain v. Islamic Rep. of Iran*, 856 F. Supp. 2d 109, 116 (D.D.C. 2012) (Lamberth, *J.*) (first ellipsis by the Court).

Plaintiffs have submitted in support of this application for a default judgment the expert reports and other materials that were submitted as evidence in *Kim.*  These are attached the declaration of Robert J. Tolchin, Esq. submitted herewith.  Plaintiffs have also submitted the expert declarations and hearing testimony from the *Warmbier* case, some of which are the same experts as *Kim,* and others are new.  The *Warmbier* materials, also attached to the Tolchin declaration, provide further corroboration, historical insight, and updated information through the date of the *Warmbier* decision.

The D.C. Circuit's opinion in *Kim* summarized the evidence and concluded by "remand[ing] with instructions to the district court to enter a default judgment on the Kims' behalf." *Kim II,* 774 F.3d at 1051.

## D.    Plaintiffs Are Eligible for a Damages Award

In creating a private right of action for victims of state-sponsored terrorism, Congress also provided that such foreign states are liable for money damages including "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. 1605A(c). "To obtain damages against a non-immune foreign state under the FSIA, a plaintiff must provide that the consequences of the foreign state's conduct were reasonably certain (i.e. more likely than not) to occur, and must prove the amount of damages by a reasonable estimate consistent with this [Circuit]'s application of the American rule on damages." *Roth*, 78 F. Supp. 3d at 402 (quoting *Salazar v. Islamic Rep. of Iran*, 370 F. Supp. 2d 105, 115-16 (D.D.C. 2005) (internal quotation marks omitted and alteration in original); *see also Kim III,* 87 F. Supp. 3d at 289 (quoting *Hill*, 328 F.3d 680, 681 (D.C. Cir. 2003)).

In this action there are no direct victim plaintiffs. The only claims presented here are for solatium damages on behalf of victim Reverend Kim's wife and children.

Title 28 U.S.C. § 1605A(c) allows for an award of solatium damages to close relatives of victims of terrorism. Solatium damages are intended to at least partially compensate the immediate relatives of an injured party for their mental anguish and the loss of the "comfort and society" previously provided by the injured party. *Fraenkel v. Islamic Rep. of Iran*, 892 F. Supp. 3d 348, 356-57 (D.C. Cir. 2018); *Flatow*, 999 F. Supp. 1, 31. "Solatium damages, by their very nature, are unquantifiable." *Braun*, 228 F. Supp. 3d at 85 (internal quotation marks omitted). As such, assessing a monetary figure to the multiple layers of harm that a terror victim or the family of a

-13-

terror victim suffers is extremely difficult.  In determining the "reasonable estimate," courts may look to expert testimony and prior awards in the many scores of civil terrorism decisions rendered pursuant to the FSIA.  *See Reed v. Islamic Rep. of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012); *Acosta v. Islamic Rep. of Iran*, 574 F. Supp. 2d 15, 29 (D.D.C. 2008).  Indeed, because "[t]here is no objective way to assign any particular dollar value" to these injuries, the courts' primary obligation is "to ensure that such awards for intangibles be fair, reasonable, predictable, and proportionate." *Turley v. ISG Lackawanna*, 774 F.3d 140, 162 (2d Cir. 2014); *cf. also Brayton v. U.S. Trade Rep.*, 641 F. Supp. 3d 521, 526 (D.C. Cir. 2011) (holding that treating like cases alike is "a necessary condition" for avoiding "arbitrary" use of judicial discretion).  Accordingly, the monetary judgments entered in this district in FSIA terrorism cases demonstrate an exceptionally broad consensus linking the amount of a judgment to the nature of the familial relationship between the claimant and the deceased.  *See Moradi v. Iran*, 77 F. Supp. 3d 57, 72 (D.D.C. 2015); *see also Cohen v. Iran*, 268 F. Supp. 3d 19, 24 (D.D.C. 2017) ("In the interests of fairness…courts try to maintain consistency of awards…among plaintiffs in comparable situations."); *Hekmati v. Iran*, 278 F. Supp. 3d 145, 163 (D.D.C. 2017) (consistency is a "primary consideration"); *Stansell v. Republic of Cuba,* 217 F. Supp. 3d 320, 345 (D.D.C. 2016) (same).

The FSIA grants to any national of the United States a claim for loss of solatium due to an act of terrorism involving personal injury against any foreign state "that is or was a state sponsor of terrorism" at the time of the underlying act of terrorism, provided that the act of terrorism involved "torture, extrajudicial killing,…or the provision of material support or resources for such an act." § 1605A(a)(2)(A)(i) and (c).  The elements that must be demonstrated are: the claim must be 1) by a U.S. national, 2) for money damages,[3] 3) the claim must be against a foreign state,

---

[3] 28 U.S.C. § 1605A(a)(1).

4) that was designated as the state sponsor of terrorism at the time of the attack or within six months thereafter,[4] 5) the underlying injury suffered must be "personal injury or death,"[5] and that personal injury or death must be 6) caused by 7) "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources" by "an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency"[6] *See Anderson v. Islamic Rep. of Iran*, 753 F. Supp. 2d 68, 79, 84 (D.D.C. 2010).

As the D.C. Circuit previously found in *Kim II,* the substantive elements are all easily satisfied here as to all Plaintiffs:

As discussed above, the term "national of the United States" for includes a permanent residence who goes on to obtain U.S. citizenship and thus has permanent allegiance to the United States.  § 1605A(5)(h); 8 U.S.C. § 1101(a)(22); *see Saludes*, 577 F. Supp. 2d at 1252; *Kim I*, 950 F. Supp. 2d at 41; *and see Kim III*, 87 F. Supp. 3d at 289.  The Plaintiffs are all now U.S. citizens, as is demonstrated by their U.S. Passports which have been filed under seal in this matter, and were U.S. permanent residents at the time of Reverend Kim's abduction, as is demonstrated in each Plaintiff's declaration.

This is a claim for money damages, as is evident on the face of the Complaint and as explained further *infra*.

This is a claim against North Korea, which is a foreign state.

As discussed above, North Korea is and was, at all pertinent times, a designated state sponsor of terrorism as that term is defined by § 1605A(h)(6).

---

[4] 28 U.S.C. § 1605A(a)(2)(A)(i)(I).

[5] 28 U.S.C. § 1605A(c).

[6] 28 U.S.C. § 1605A(a)(1).

As was held in *Kim,* Reverend Kim, the kidnapping victim, was tortured and murdered by Defendant North Korea, which continues to hold his body in a cruel affront to his widow and orphaned children.

The D.C. Circuit in *Kim II* held that Plaintiffs had met their statutory burden of producing evidence satisfactory to the court.  This Court may rely on the evidence produced in *Kim* without requiring the Plaintiffs here to re-submit and re-establish that same evidence, to reach its own findings as to those elements that *Kim* found to have been demonstrated with clear and convincing evidence.  *Fain v. Islamic Rep. of Iran*, 856 F. Supp. 2d 109, 115-16 (D.D.C. 2012).

Because North Korea has defaulted and Plaintiffs' claims remain undisputed, Plaintiffs respectfully submit that upon considering the evidence submitted in *Kim* and in this action, Plaintiffs have plainly submitted satisfactory evidence as to each of their claims.

## IV.

## PROPOSED SOLATIUM DAMAGES AWARDS

In actions brought under § 1605A, plaintiffs are entitled to "economic damages, solatium, pain, and suffering, and punitive damages." § 1605A(c).

Plaintiffs have submitted declarations from each of the Plaintiffs, as well as the record and precedent of the *Kim* case which involves members of the same family of the same degree of kinship.  While the Court must determine its own award of damages, as guidance for determining the quantum of damages, the Court can be aided by other abduction and torture victim civil actions under the FSIA.  In determining the appropriate amount of compensatory damages, the Court may look to prior decisions awarding damages for pain and suffering, and to those awarding damages for solatium.  In addition to providing awards to individuals who have been victims of kidnapping and torture the courts have also made significant awards to plaintiffs who endured the trauma and

emotional impact of having a relative abducted and held under conditions amounting to torture for extended periods of time. The courts have looked at the nature of the relationship between the victim and the family member plaintiff as well as the amount of time that the victim was held in captivity.

In one of the earliest cases brought under § 1605A, *Cicippio v. Islamic Rep. of Iran*, 18 F. Supp. 2d 62 (D.D.C. 1998), the court awarded $10 million each to two spouses of victims held hostage and tortured for 63 and 44 months, respectively:

> Mrs. Cicippio and Mrs. Reed were denied their husbands' society and companionship for 63 and 44 months, respectively. They endured those months in great distress, never knowing if their husbands were being tortured or were even still alive. Even today they continue to suffer from the changes that prolonged captivity and abuse produced in their husbands. In short, they have already endured many years of mental anguish that may have exceeded the grief normally experienced as a result of the death of a loved one, and will in all likelihood continue to do so into an uncertain future. Accordingly, Elham Cicippio and Fifi Delati-Reed are awarded damages and shall each have judgment for $10 million.

*Id.* at 69.

In *Higgins v. Islamic Rep. of Iran*, 2000 WL 33674311 (D.D.C. 2000) the wife and daughter of an American army officer who was kidnapped and tortured by Hezbollah in Lebanon brought suit against the government of Iran for their damages. The court found that the defendant liable for the solatium and emotional distress the family members had suffered as a result of the kidnapping and torture and subsequent death of their loved one:

> The court has briefly described her grueling ordeal and its emotional toll on her and the family relationships. Although a strong woman who has moved forward with her life, Robin Higgins's grief at the loss of her husband and the knowledge she has concerning his treatment and killing by his captors will always be with her. In support of Christine Higgins's claim for solatium, Christine Higgins described her caring relationship with her father, and his pivotal role in her life as parent and advisor. His permanent absence from her life has disrupted her family

> relationships, and her educational plans. She has been bereft of the guidance he would have provided throughout her life. The emotional damage to her, and the last memories of her father as a captive will have a lasting impact. Therefore, the record at trial supports an award of damages for their pain, mental anguish, and suffering.

*Id.* at 7. The court awarded the wife and daughter $12 million each in compensatory damages, and $300 million in punitive damages.

In *Polhill v. Islamic Rep. of Iran*, 2001 WL 34157501 (D.D.C. 2001), involving the kidnapping and torture by Hezbollah in Lebanon of an American professor, the court found the government of Iran responsible for the damages inflicted upon the victim and his family over his 39 months in captivity. The court awarded the victim's wife and children $10 million and $3.25 million respectively.

> Ferial, Stephen, and Brian Polhill each testified about the impact of Robert's kidnapping and captivity upon their own lives and the emotional trauma that they suffered with each release of a photograph or information, true or false, about the hostages. Stephen and Brian were both living in the United States when their father was kidnapped, and each learned of the kidnapping from a special news report that interrupted network television coverage of basketball…. All three family members testified about the emotional difficulties of coping with the precarious uncertainty of his future and apprehension as to whether they would ever see him again…. Plaintiff Ferial Polhill seeks compensatory damages based on causes of action of intentional infliction of emotional distress, and loss of consortium and solatium. Mrs. Polhill is a naturalized U.S. citizen. Plaintiffs Stephen and Brian Polhill each seek compensatory damages for loss of solatium. Employing essentially the same calculus as in *Cicippio* and *Anderson*, the Court will award compensatory damages to Ferial Polhill in the amount of $10,000,000 and to Stephen and Brian Polhill in the amount of $3,250,000 each.

*Id.* at 3.

Additionally, in *Surette v. Islamic Rep. of Iran,* 231 F. Supp. 2d 260 (D.D.C. 2002), the court awarded the common law wife and sister of a kidnap and torture victim $10 million and $2.5 million respectively:

> It is apparent from Ms. Surette's account of the intimacy she shared with William Buckley that she suffered a great loss during and after his abduction, torture and death. Based on the evidence before it, the Court finds that Ms. Surette is entitled to recover damages for solatium in the amount of $10,000,000. While no amount of money could ever truly compensate Ms. Survette for the agony she has suffered, the Court finds this to be a fair award, consistent with the relief awarded in similar cases by other judges of this Court.

*Id.* at 271.

In *Anderson v. Islamic Rep. of Iran*, 90 F. Supp. 2d 107 (D.D.C. 2001), the court awarded $10 million to the wife of a kidnapping victim who was held by Hezbollah for 2,454 days in Lebanon. In addition, the court awarded his daughter who had not even been born at the time of the abduction $6.7 million, roughly $1 million for each year that her father was held in captivity:

> Plaintiff Sulome Anderson, who is the minor daughter of Terry Anderson and Madeleine Bassil, seeks compensatory damages for loss of solatium. Employing essentially the same calculus as it did in Cicippio, supra, the Court will award compensatory damages to Terry Anderson in the amount of $24,540,000; to Madeleine Bassil in the amount of $10,000,000; and to Sulome Anderson in the amount of $6,700,000.

*Id.* at 113.

*Sutherland v. Islamic Rep. of Iran*, 151 F. Supp. 2d 27 (D.D.C. 2001) utilized the same formula in determining the appropriate the compensatory damages to a spouse, awarding her $10 million for the "extensive loneliness, psychological isolation, and anxiety" she was subjected to:

> Like the calculation of Mr. Sutherland's damages, the Court's calculation of Mrs. Sutherland's damages is guided by previous cases dealing with substantially the same events. In *Anderson v. The Islamic Republic of Iran*, Terry Anderson's wife received $10,000,000, as did the wives of hostages Joseph Cicippio and Frank Reed in *Cicippio v. The Islamic Republic of Iran*. *See Anderson*, 90 F. Supp. 2d at 113; *Cicippio*, 18 F. Supp. 2d at 70. Further, the Court relies on its analysis of solatium damages in *Flatow v. The Islamic Republic of Iran*, 999 F. Supp. at 29-32. All of these factors, taken together with Congress' tacit approval of previous damage calculations, suggest that Jean Sutherland's demand of $10,000,000 is merited.

*Id.* At 51.

Moreover, the court followed the calculation employed by *Anderson* and when it awarded each of the victim's three daughters the sum of $1 million, or $6.5 million individually, for each year their father was held captive:

> Thomas Sutherland's three daughters seek solatium damages for their six-and-a-half years of suffering. Their suffering, which consisted of extensive anxiety, frustration, and loneliness is summarized in the Court's Findings of Facts listed above. Based on this suffering, the Court finds that each daughter is entitled to the amount requested, $6,500,000. Besides being supported by the evidence presented in court, the Court's calculation of damages is consistent with previous awards in substantially similar cases. For instance, in *Flatow*, the Court awarded $2,500,000 to each of sibling of a bombing victim for the suffering they had undergone. *See Flatow*, 999 F. Supp. at 32. Similarly, in *Anderson*, the court awarded Terry Anderson's daughter $1 million for each year Anderson was held hostage. Thus, Sulome Anderson was awarded $6,700,000. See Anderson, 90 F. Supp. 2d at 114. Like the above damage calculations, these calculations can be considered tacitly approved by Congress in its October 28, 2000 enactment of the Victims of Trafficking and Violence Protection Act of 2000.

*Id.* at 52.

In *Steen v. Islamic Rep. of Iran*, 2003 WL 21672820 (2003), the court awarded $15 million to the spouse of an American professor abducted in Lebanon. The wife was denied the company of her husband for a period of five years. The court enhanced the award from $10 million to $15 to reflect additional burden that been placed upon her as a result of her husband's physical deterioration:

> For nearly five years, her only news of her husband came through photographs and videotapes released by his captors. She experienced great pain as a result of her separation from "her best friend" and suffered extreme anguish upon watching the dramatic deterioration of his condition over time. With respect to Virginia Steen's claims for solatium, I will again recommend that the court follow the precedent set by other judges of this court who have awarded family members damages based on a showing that the extreme and outrageous conduct inflicted against a loved one

also causes severe emotional distress to those close to the victim.  *See Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d at 89; *Wagner v. Islamic Republic of Iran*, 172 F. Supp. 2d 128, 136, n.  11 (D.D.C.2001); *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d at 35-36.  In this case, the defendants' conduct was patently outrageous and the emotional distress caused to Virginia Steen is undeniable.  I recommend, therefore, that the court find that Virginia Steen is entitled to damages for solatium.  $10 million was awarded to spouses in the Polhill and Turner claims.  I recommend that the court enhance that figure to $15 million to compensate Mrs. Steen for the additional burden she bears as a caregiver for her husband in light of his worsening medical condition and in light of the fact that he was held longer than the other hostages.

*Id.*  at 5.

Since the abduction of Reverend Kim in January 2000, Reverend Kim's widowed wife Young Hwa Chung Kim and orphaned children, his daughter Dani Butler and his son Chun Kook Kim, have suffered greatly from the loss of their loving husband and father.  For more than 25 years, they have experienced substantial pain and suffering caused by the abduction, torture, and murder of Reverend Kim and for many long years not having any information about his precise whereabouts or wellbeing, and not having his body returned so that they could provide him with a proper funeral.

The Court in *Kim III* analyzed the appropriate solatium damages award to the family members of Reverend Kim as follows:

In order to be awarded compensatory damages, "a plaintiff must prove that the projected consequences [of the defendant's actions] are 'reasonably certain' (i.e. more likely than not) to occur, [or that actual consequences have occurred,] and must prove the amount of damages by a 'reasonable estimate' consistent with [the D.C. Circuit's] application of the American rule on damages." *Hill v. Republic of Iraq*, 328 F.3d 680, 681, 356 U.S. App.  D.C. 142 (D.C. Cir. 2003).  Damages are assessed through findings as to each plaintiff, "including the injuries [he] suffered…and [his] citizenship (as is relevant to [his] entitlement to recover under section 1605A of the FSIA)." *Roth*, 2015 U.S. Dist.  LEXIS 9390, 2015 WL 349208 at *4.

Han Kim is a resident of St. Charles, Missouri and was born on October 23, 1976 in Jinhae, South Korea. Decl. of Han Kim, ECF No. 17 ¶¶ 1-2. He is the youngest child of Reverend Kim and Jung Soon Kim. *Id.* ¶ 3. When Reverend Kim was abducted in 2000, Han Kim was a permanent resident of the United States, and later became a U.S. citizen in 2003. *Id.* ¶ 4. Han Kim had a loving relationship with his father throughout his childhood and recalls his father as a unifying force in the family at the untimely death of Han Kim's mother. *Id.* ¶¶ 6-12. At the age of 16, Han Kim travelled to the United States where he graduated from high school and college. *Id.* ¶¶ 14-16.

Han Kim's sister Dani told him about his father's abduction a few days after Reverend Kim's kidnapping. *Id.* ¶ 24. In "[t]he days following the report that [his] father had been violently kidnapped…[he] was seized with apprehension and fears about his [father's] wellbeing and fate." *Id.* ¶ 27. Being so far away made it "especially painful and frustrating." *Id.* Han Kim found himself "unable to sleep" and unable to "stop thinking about what had happened to [his] father." *Id.* The abduction occurred while Han Kim was still in college, and made it difficult for him to focus on his studies. *Id.* ¶ 28. Not knowing for certain what has happened to his father has caused him "suffering and grief." *Id.* ¶ 30. It is evident from Han Kim's declaration that he has been deeply affected by his father's kidnapping, and presumed torture and death. *Id.* ¶ 35-45.

Yong Seok Kim is a resident of Newark, California and a U.S. citizen. Decl. of Yong Seok Kim, ECF No. 18 ¶ 1. Reverend Kim was Yong Kim's older brother by seven years. *Id.* ¶ 5. Yong Kim was very close to his older brother and viewed him as a father figure. *Id.* ¶ 9. Reverend Kim provided meaningful advice to Yong Kim throughout Reverend Kim's life. *Id.* ¶ 11. After Yong Kim moved to the United States in 1985, Reverend Kim visited him two to three times a year, and they maintained a close relationship. *Id.* ¶ 12.

Yong Kim recalls learning about Reverend Kim's abduction from Yong Kim's nephew, Tae Ha Kim. *Id.* ¶ 16. The initial notice of his brother's abduction caused him to be in shock and fear for his brother's life. *Id.* ¶ 17. Yong Kim "thought about [his] brother day and night and [he] was unable to sleep." *Id.* After some time with no notice of Reverend Kim's whereabouts, Yong Kim's "shock turned to despair and depression." *Id.* ¶ 18. Reverend Kim's abduction, and the lack of information as to his condition, made it difficult for Yong Kim to work, focus, and maintain family relationships. *Id.* ¶ 19. "The unrelenting worry and fear over [his] brother's abduction has caused [him] to experience a long term sadness and depression." *Id.* ¶ 28. It is clear from Yong Kim's declaration that Reverend Kim's

abduction, and presumed torture and death have caused him great emotional strife and has profoundly affected his life.

The Kims seek compensatory damages for their pain, suffering, and solatium. HN5 Solatium, a form of compensatory damages, seeks "to compensate persons for mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as well as the harm caused by the loss of the decedent's society and comfort." *Roth*, 2015 U.S. Dist. LEXIS 9390, 2015 WL 349208 at \*15 (*quoting Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 25 (D.D.C. 2011)) (internal quotation marks and alterations omitted). "Courts may presume that those in direct lineal relationships with victims of terrorism suffer compensable mental anguish[,]…and testimony proving a close emotional relationship will usually be sufficient to sustain an award of solatium damages" for siblings. *Id*. Han Kim and Yong Kim have both demonstrated a close emotional relationship to Reverend Kim, and both have expressed their deep grief as a result of his abduction, and presumed torture and death.

While it is difficult to quantify the grief that Han Kim and Yong Kim have experienced, and continue to experience, as a result of North Korea's violent actions, these plaintiffs are entitled to compensation for their loss, pain, mental anguish, and suffering. Accordingly, Han Kim and Yong Kim will be awarded a judgment of $15,000,000 each against North Korea in compensatory damages, amounting to approximately $1,000,000 per year since Reverend Kim's initial abduction in 2000. This calculation is within the range of damage awards in similar cases that involve abduction and torture by a non-immune foreign sovereign. *See, e.g., Massie v. Gov't of Democratic People's Republic of Korea*, 592 F. Supp. 2d 57, 77 (D.D.C. 2008) (awarding $1,250,000 to the spouse of a torture victim held for nearly one year by North Korea); *Anderson v. Islamic Republic of Iran*, 90 F. Supp. 2d 107, 114 (D.D.C. 2000) (awarding $6,700,000 to the daughter of a torture victim held for approximately six and a half years); *Cicippio v. Islamic Republic of Iran,* 18 F. Supp. 2d 62, 70 (D.D.C. 1998) (awarding $10 million to the spouse of a torture victim held for 63 months and $9 million to the spouse of a torture victim held for 44 months).

*Kim III*, 87 F. Supp. 3d at 289-90.

The Plaintiffs in this case are the widow and two orphaned children of Reverend Kim. The two children, Plaintiffs Dani Butler and Chun Kook Kim, have claims that are comparable to those of Plaintiff Han Kim in the Kim case, who was also a child of Reverend Kim, and should receive

a comparable solatium damages award.  Plaintiff Young Hwa Chung Kim, the widow of Reverend Kim, should receive a larger award, both because of the special ties and financial interdependence between a husband and wife and because, as the declarations she suffered more severely than the children as a result of Reverend Kim's disappearance.

The declaration of Plaintiff Young Hwa Chung Kim sets forth that as a result of the kidnapping of Reverend Kim, her physical and mental health deteriorated, experiencing panic with every telephone call and visitor.  (Young Hwa Chung Kim Decl. ¶ 12).  As a result of the kidnapping, torture, murder, and disappearing of Reverend Kim, she experienced nightmares, *id.,* ¶ 15, and became severely depressed, *id.,* ¶ 16, ultimately being hospitalized in a psychiatric hospital for a year and a half after she heard the news that Reverend Kim had been murdered, *id.,* ¶ 17, ultimately winding up in a long term nursing facility for ten years, and now in a supportive living facility, *id.* attributes the entire course of her mental health issues to the actions of North Korea, and remains deeply traumatized that North Korea has not even returned Reverend Kim's body, *id.,* ¶ 24.  She missed out on a lifetime of experiences that she will never be able to have with her husband and as a family, *id.,* ¶¶ 18-26.

The declaration of Plaintiff Chun Kook Kim, who is the son of Reverend Kim and Plaintiff Young Hwa Chung Kim, confirms his mother's ordeal and provides details of his own.  He was only 10 years old when Reverend Kim was kidnapped, (Decl. Chun Kook Kim, ¶ 9).  After the abduction, his mother at first became absent to him because she was directing all her efforts to free Referend Kim, *id.,* ¶ 10, and later because she became depressed and dysfunctional, *id.*  He found himself unable to address his own emotions because—at the age of 10—he had to care for his mother, *id.,* ¶ 11.  He found out his father was dead at the age of 11 or 12, *id.,* ¶ 12.  Because of his mother's mental breakdown caused by the kidnapping, Chun was left without functioning

parents. After his mother was hospitalized in a psychiatric facility for depression he was taken in by a pastor and his wife who had been friends with Reverend Kim at age 13 and remained with them until he was 17, *id.,* ¶ 13. Though he was cared for, he nevertheless felt alone and abandoned growing up, and was left feeling guarded and distant, *id.,* ¶¶ 13-14. In essence, North Korea took his father literally and his mother emotionally, and he was left alone from the age of 10, *id.,* ¶ 15. These experiences of instability growing up have left Chun very anxious about change and he has difficulty functioning without a routine, *id.,* ¶¶ 20-22. He feels he struggles with parenting because his parents were taken from him at a young age, *id.* ¶ 23. He still misses his father greatly and feels sorrow that his father never lived to see milestones in his life, like defending his dissertation, his wedding, and the birth of his children, *id.,* ¶¶ 25, 26. He remains deeply saddened that he will never be able to see his father be a grandfather, *id.,* ¶ 27. He is greatly pained that he was not able to give his father proper funeral rites, *id.* His life is haunted by the long-term consequences of the tragic fate that befell Reverend Kim, *id.,* ¶ 28.

The third Plaintiff, Dani Butler, is significantly older than Plaintiff Chun Kook Kim, being the product of Reverend Kim's first marriage. Her mother, Reverend Kim's first wife, was killed in a car crash along with her grandfather when she was 12 (Decl. Dani Butler, ¶ 15). Her father and grandmother were severely injured, and Dani was cast into the role of primary caregiver for a year, *id.,* ¶ 16. As a result of the premature death of her mother and her father's injury, Dani became very close with her father, *id.,* ¶¶ 17-18. Reverend Kim was kidnapped shortly after Dani's wedding, and she never saw him again, *id.,* ¶¶ 29-30. She became depressed and barely able to function, unable to work, living in limbo, worried about her own safety from North Korean retaliation, *id.,* ¶¶ 34-38. The kidnapping of her father so affected Dani that even as a newlywed she had to move into her mother-in-law's home so she could help Dani through the anguish of

depression and anxiety, *id.,* ¶ 39.  While the kidnapping propelled her father's memory into becoming a famous public figure in South Korea, that very fame left Dani and her brother living in fear that North Korea would retaliate against them or other members of their family, *id.*, ¶ 40. Dani explains that the kidnapping of her father left her entire family in a shambles, with her step-mother suffering from depression, her brother Chun having to live in a foster home and be an 11 year old child growing up knowing that a ruthless totalitarian regime had murdered his father and having to grow up without his parents, *id.* ¶ 42.  Dani had lost her mother at a young age and as a result of the kidnapping and murder of her father she was deprived of her sense of home and belonging, emotions she carries to this day, *id.* ¶ 45.  When Dani ultimately learned from the South Korean criminal case that her father was dead, it brought a certain amount of closure, but again she suffered an emotional toll and had to move into her mother-in-law's house for about a year, *id.* ¶¶ 47-48.  For many years she avoided anything that reminded her of her father, and so was not able to visit her family in South Korea, *id.*, ¶ 49.  The North Korean regime's failure to return Reverend Kim's body so that a proper funeral could be held is particularly grievous to Dani, *id.*, ¶¶ 38, 48, 57.  Dani's life has been "irreparably damaged" by the abduction and murder of her father, and she lives "in constant fear, anguish and sadness," feeling "orphaned, abandoned, vulnerable and alone" without her father, *id.,* ¶ 59.

Presented with similar victim-impact evidence, the *Kim* court awarded the plaintiffs in that case approximately $1 million per year, or $15 million each, for their solatium damages.  One could argue that it has been 25 years now so there should be an award of $25 million to each of our three plaintiffs, but at the same time that would be unfair to the plaintiffs from *Kim* who would wonder why they cannot update their judgment to add another 10 years of damages.  At the same time, there has been considerable inflation since 2015.  According to the inflation calculator on

the Bureau of Labor Statistics website, there has been 36.53% inflation between 2015 and 2025, meaning that the value of $15 million in 2015 dollars is $20.047 million in 2025 dollars. Accordingly, Plaintiffs believe it would be fair and appropriate to award each of the sibling plaintiffs, Dani Butler and Chun Kook Kim, $20 million dollars for their solatium damages. The spouse plaintiff, Young Hwa Chung Kim, should receive something more, as her damages are intrinsically deeper. It is respectfully requested that she receive an award of $25 million for her solatium damages.

## V.

## PROPOSED PUNITIVE DAMAGES

Plaintiffs also seek punitive damages, which are awarded not to compensate the victims, but to "punish outrageous behavior and deter such outrageous conduct in the future." *Kim*, 87 F. Supp. 3d at 290 (quoting *Bodoff v. Islamic Rep. of Iran*, 907 F. Supp. 2d 93, 105 (D.D.C. 2012) (internal quotation marks omitted)); *see also* Restatement (Second) of Torts § 908(1) (1977). Punitive damages are warranted where "defendants supported, protected, harbored, aided, abetted, enabled, sponsored, conspired with, and subsidized a known terrorist organization whose modus operandi included the targeting, brutalization, and murder of American citizens and others." *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 85 (D.D.C. 2011). The Defendants' conduct in supporting Hamas, PIJ and Hezbollah justifies the imposition of punitive damages here.

In determining the appropriate amount of punitive damages, courts consider "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Wultz v. Islamic Rep. of Iran*, 864 F. Supp. 2d 24, 41 (D.D.C. 2012) (quoting *Acosta*,

574 F. Supp. 2d at 30).  Several approaches have been articulated for calculation of the appropriate amount of punitive damages in state-sponsored terrorism cases.  One approach is to multiply the foreign state's "annual expenditures on terrorism" by a factor between three and five.  *See Baker*, 775 F. Supp. 2d at 85 (citing *Valore v. Islamic Rep. of Iran*, 700 F. Supp. 2d 52, 88-90 (D.D.C. 2010); *Acosta*, 574 F. Supp. 2d at 31); *Beer v. Islamic Rep. of Iran*, 798 F. Supp. 2d 14, 26 (D.D.C. 2011).  This approach, which may result in awards in the billions of dollars, has been used in the case of exceptionally deadly attacks, such as the 1983 bombing of the Marine barracks in Beirut, which killed 241 American military servicemen.  *See Baker*, 775 F. Supp. 2d at 85.  Another approach awards a fixed amount of $150 million per affected family.  *See Wyatt v. Syrian Arab Republic,* 908 F. Supp. 2d 216, 233 (D.D.C. 2012) (awarding $300 million in total to two victims and their families); *Baker*, 775 F. Supp. 2d at 86 (awarding $150 million each to families of three deceased victims); *Gates*, 580 F. Supp. 2d at 75 (awarding $150 million each to the estates of two victims).

The *Kim* Court awarded $300 million in punitive damages, *Kim III,* 87 F. Supp. 3d at 290-91.  Plaintiffs submit that this Court should enter an equivalent award of punitive damages in this case.

## VI.

### THE STATUTE OF LIMITATIONS DOES NOT BAR THIS ACTION

The statute of limitations does not bar this action.  The 10-year statute of limitations "is not jurisdictional" and is an affirmative defense waived by the Defendant's default.  *Owens v. Rep. of Sudan*, 864 F.3d 751, 801, 804 (D.C. Cir. 2017) ("Sudan has forfeited its affirmative defense [regarding the statute of limitations] by failing to raise it in the district court.  The statute of limitations defense having been forfeited, this Court lacks authority to raise it on behalf of the

defaulting defendant Syria. *Maalouf v. Islamic Republic of Iran*, 440 U.S. App. D.C. 451, 470-71

(2019) ("we hold that the District Courts here lacked authority or discretion to *sua sponte* raise the

terrorism exception's statute of limitations.")

<u>**CONCLUSION**</u>

For the reasons set forth above, Plaintiffs respectfully request that this Court grant

Plaintiffs' motion for a judgment by default and enter judgment in the Plaintiffs' favor in the

amounts set forth herein.

Dated:   Brooklyn, New York
         March 31, 2025

                                         Respectfully submitted,

                                         THE BERKMAN LAW OFFICE, LLC
                                         *Attorneys for Plaintiffs*

                                         by: _____
                                             Robert J. Tolchin

                                         829 East 15th Street, Box 7
                                         Brooklyn, New York 11230
                                         718-855-3627