UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DANI BUTLER, et al.,<br><br>    *Plaintiffs*,<br><br>v.<br><br>DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA,<br><br>    *Defendant*. | Case No. 20-cv-02514 (ACR) |

## MEMORANDUM OPINION AND ORDER

The Democratic People's Republic of Korea (North Korea)—one of a handful of states whose egregious human-rights abuses first prompted the passage of the terrorism exception to the Foreign Sovereign Immunities Act (FSIA)—kidnapped Reverend Dong Shik Kim (Reverend Kim or the Reverend) from China in 2000. Strong evidence suggests that thereafter, it tortured and eventually killed the Reverend in a *kwan-li-so*, a political penal-labor colony. Some of his relatives have already successfully sued North Korea for damages under the terrorism exception. Plaintiffs in this case are additional relatives: Reverend Kim's widow (Young Hwa Chung Kim) and two of his children (Dani Butler and Chun Kook Kim). They moved for default judgment when North Korea failed to appear.

After independently weighing the evidence submitted, the Court GRANTS the Motion for Default Judgment, Dkt. 28, and awards damages to Plaintiffs.

### I.   BACKGROUND

This case concerns the same events as those at the center of a previous suit that Reverend Kim's son and brother brought. *See Han Kim v. Democratic People's Republic of*

1

*Korea* (*Han Kim I*), 950 F. Supp. 2d 29 (D.D.C. 2013), *rev'd and remanded*, *Han Kim II*, 774 F.3d 1044 (D.C. Cir. 2014); *Han Kim v. Democratic People's Republic of Korea* (*Han Kim III*), 87 F. Supp. 3d 286 (D.D.C. 2015).  "In 1993[,] Reverend Kim moved to China from his congregation in the [United States] to work as a missionary providing humanitarian and religious service for the families of North Korean descent who had fled across the Chinese–[North] Korean border."  Dkt. 24-1 (Report of Yoshikuni Yamamoto) ¶ 20.  He "set up numerous refugee shelters and a school . . . for expatriate North Korean children and handicapped persons" near the border.  *Id*.  A South Korean court later convicted a North Korean intelligence agent of Reverend Kim's 2000 abduction from China.  Dkt. 24-2 (Decl. of J.D. Kim & South Korean Court Order) at 4.  Following his abduction, the trail of direct evidence concerning Reverend Kim's fate grows cooler.  But according to a 2009 U.S. Department of State (State Department) Country Report and various other pieces of evidence discussed below, North Korea likely imprisoned, tortured, and killed the Reverend within the year.  *See* Dkt. 24-14 (Decl. of Robert Tolchin & 2009 State Department Country Report) at 3.

After the conclusion of the *Han Kim* litigation, Young Hwa Chung Kim, Butler, and Chun Kook Kim filed the instant suit also seeking compensatory and punitive damages.  Plaintiffs served North Korea pursuant to 28 U.S.C. § 1608(a)–(b).  Dkt. 19.  After North Korea failed to appear, the Clerk of Court entered default.  Dkt. 22; *see* Fed. R. Civ. P. 55(a).

The Court now considers Plaintiffs' Motion for Default Judgment.  Plaintiffs submitted in support the documentary evidence submitted in the *Han Kim* litigation, along with four pieces of evidence presented in another case concerning North Korea's abuse of a U.S. citizen, *Warmbier v. Democratic People's Republic of Korea*, No. 18-977 (BAH) (D.D.C.).  *See* Dkt. 24.

2

In addition, each Plaintiff has provided the Court a declaration for its consideration. Dkts. 25–27.

## II.    LEGAL STANDARD

Default judgment is appropriate where "the claimant[s] establish[] [their] claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). In the *Han Kim* case, the Circuit clarified how district courts should apply the § 1608(e) standard when it reversed the district court's initial denial of default judgment to one of the Reverend's sons and his brother. Even though the plaintiffs had presented no "direct, firsthand evidence of [Reverend Kim's] torture and murder," the Circuit concluded that (1) evidence of Reverend Kim's abduction, coupled with (2) expert testimony establishing that North Korea "invariably tortures and kills prisoners like him" in a *kwan-li-so* sufficed under the statute. *Han Kim II*, 774 F.3d at 1045, 1050.[1]

On remand, the district court entered default judgment in favor of the *Han Kim* plaintiffs and awarded damages. *Han Kim III*, 87 F. Supp. 3d at 291. The Court now determines its jurisdiction and the sufficiency of the proffered evidence in this action under the same standard.

## III.    ANALYSIS

The Court has jurisdiction in this case to the extent that North Korea's actions qualify for the FSIA's terrorism exception. Concluding that North Korea is indeed liable under that provision, the Court awards damages to Plaintiffs.

---

[1] Plaintiffs must also submit evidence admissible under the Federal Rules of Evidence. *Han Kim II*, 774 F.3d at 1049. They have satisfied this standard here. *See id*. at 1049–50; *Sotloff v. Syrian Arab Republic*, 525 F. Supp. 3d 121, 130 nn.8, 10 (D.D.C. 2021); Fed. R. Evid. 702 (permitting expert testimony); Fed. R. Evid. 803(8) (providing for the public-records exception to the inadmissibility of hearsay evidence).

3

A. **The FSIA's Terrorism Exception**

North Korea is both "a mainstay on the State Department's list of terror sponsors" and "one of a small handful of bad actors that spurred Congress to adopt the terrorism exception in the first place." *Han Kim II*, 774 F.3d at 1046 (citing H.R. Rep. No. 104-383, at 62 (1995)).[2] That exception provides that the ordinary immunization of foreign governments from suits in U.S. courts does not attach to state sponsors of terrorism like North Korea. Rather, plaintiffs may recover from North Korea for "torture" and "extrajudicial killing," among other acts. 28 U.S.C. § 1605A(a)(1).

For purposes of the statute, torture is "any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering . . . is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual . . . , intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind." *Id*. § 1605A(h)(7); *id*. § 1350 statutory note. An extrajudicial killing is "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." *Id*. § 1605A(h)(7); *id*. § 1350 statutory note.

---

[2] The FSIA requires designation of the defendant state as a sponsor of terrorism when the relevant events occurred; and either continued designation when the claim was filed or designation "within the 6-month period before the claim [wa]s filed." 28 U.S.C. § 1605A(a)(2)(A)(i)(I). This action meets these criteria. The State Department first so designated North Korea in 1988, *see* 53 Fed. Reg. 3477 (Feb. 5, 1988), and then rescinded that designation in the period 2008 to 2017, *see* 73 Fed. Reg. 63540 (Oct. 24, 2008). The State Department redesignated North Korea in 2017. *See* 82 Fed. Reg. 56100 (Nov. 27, 2017). Plaintiffs filed their Complaint in September 2020.

Plaintiffs in this case meet the threshold eligibility requirement in the terrorism-exception provision. Each was a legal permanent resident at the time of North Korea's actions and has since obtained citizenship. *See* Dkt. 23 (Decl. of Robert J. Tolchin & Pls.' Passports); Dkt. 25 (Butler Decl.) ¶ 4; Dkt. 26 (Chun Kook Kim Decl.) ¶ 4; Dkt 27 (Young Hwa Chung Kim Decl.) ¶ 6. They may recover under the statute because "individual[s] deemed to owe a permanent allegiance to the United States and who actively pursue[] U.S. citizenship" satisfy the requirement in 28 U.S.C. § 1605A(a)(2)(A)(ii)(I) that they are "nationals of the United States" "at the time the [covered] act" occurred. *See Han Kim I*, 950 F. Supp. 2d at 41; *Asemani v. Islamic Republic of Iran*, 266 F. Supp. 2d 24, 27 (D.D.C. 2003).[3]

Altogether, then, this Court has jurisdiction to enter default judgment in favor of Plaintiffs to the extent that their evidence establishes to the Court's "satisfact[ion]," 28 U.S.C. § 1608(e), that North Korea tortured or killed Reverend Kim without due process. *See Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 69 (D.D.C. 2015).[4]

## B. The Court Will Independently Weigh the Evidence in This Case

The Court next considers the weight it can accord the *Han Kim* litigation, given its shared facts with the instant case.

Courts in this Circuit have declined to give full issue-preclusive effect to determinations made in prior cases on default judgment, because such prior cases lacked adversarial presentation of factual issues. *See Weinstein v. Islamic Republic of Iran*, 175 F. Supp. 2d 13, 20

---

[3] The statute, 28 U.S.C. § 1605A(h)(5), incorporates the definition of "national of the United States" contained in 8 U.S.C. § 1101(a)(22), which defines a "national of the United States" to include individuals "ow[ing] permanent allegiance to the United States."

[4] The statute of limitations poses no bar to this action here. The ten-year limitations period, 28 U.S.C. § 1605A(b) is a "nonjurisdictional" "affirmative defense[]" that North Korea forfeited when it failed to appear or raise this defense. *Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1109 (D.C. Cir. 2019).

(D.D.C. 2001); 18A Wright & Miller's Federal Practice & Procedure § 4442 (3d ed. Sept. 2025 update). Rather, as a compromise, they have taken judicial notice of the relevant prior opinion and then "review[ed] evidence considered" in the previous case for the purposes of making their own findings "without [requiring] the re-presentment of such evidence." *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 59 (D.D.C. 2010); *accord Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 47 (D.D.C. 2009). In this particular case, however, the Court is mindful that the Circuit, and not merely another district court, has concluded in a precedential opinion that the very pieces of evidence now before this Court supported default judgment in favor of Reverend Kim's relatives. *See Han Kim II*, 774 F.3d 1044.

To eliminate all doubt, however, the Court follows the lead of other district courts in taking judicial notice of the relevant *Han Kim* decisions and *Warmbier v. Democratic People's Republic of Korea*, 356 F. Supp. 3d 30 (D.D.C. 2018). It dispenses with the formal presentation of the same evidence from those cases in this present action and will undertake an independent examination of the submissions under the default-judgment standard.

### C. The Evidence Supports the Conclusion That North Korea Tortured and Killed Reverend Kim Without Due Process

The Court concurs with the *Han Kim* decisions that the evidence supports default judgment here.[5]

There is direct evidence, via South Korea's conviction of the responsible North Korean agent, that North Korea abducted Reverend Kim while he was undertaking his missionary work in China in 2000. *See supra* p. 2. Other indirect evidence makes clear North Korea tortured and

---

[5] While Plaintiffs' Complaint also asserts state-law claims, *see* Dkt. 1 at 15–16, their Motion for Default Judgment focuses upon the FSIA count only, *see* Dkt. 28-1 at 1. Therefore, with its grant of default judgment as to the FSIA claim, the Court disposes of all of Plaintiffs' claims.

killed him.  As the 2009 State Department Country Report explains, "[i]n 2008[,] the media reported South Korean missionary Kim Dong-shik had most likely died within a year of his 2000 disappearance."  2009 State Department Country Report at 3.  And among other pieces of evidence about the operation of the *kwan-li-so*, Plaintiffs offer the declarations of Professor David Hawk, an expert on human rights in North Korea who has interviewed dozens of former *kwan-li-so* prisoners, Dkt. 24-6 (Hawk Decl.); and Ernest Downs, a former senior Defense Department official and member of the board of the U.S. Committee for Human Rights in North Korea, Dkts. 24-7 (Downs Decl.), 24-16 (Supp. Downs Decl.).

Those declarations indicate that North Korea tortured Reverend Kim.  Professor Hawk averred that Reverend Kim was "likely . . . transferred to a *kwan-li-so*" following his abduction.  Hawk Decl. ¶ 20.  He explained that prisoners in the *kwan-li-so* "are provided only enough food to be kept on the verge of starvation" and endure "[b]rutal beatings."  *Id*. ¶¶ 14–15.  The Reverend likely had to perform at least twelve hours of "back-breaking labor" every day of the week.  *Id*. ¶ 14.  And a "customary punishment" in the *kwan-li-so* is "long-term solitary confinement in punishment cells which do not have enough space for a person to completely lie down or stand up, causing inmates to experience a loss of circulation and atrophy of legs, and often leading to death within several weeks."  *Id*. ¶ 15.  Meanwhile, Downs explained that he does not "know of any case in which [a] . . . prisoner was *not* subjected to torture while in the prison camp."  Supp. Downs Decl. ¶ 10.  Such acts of torture include mutilation, deprivation of sleep and food, beatings, water torture, and stress positions, including being made to kneel motionless for hours and "'pigeon torture' with [one's] arms pinned behind [one's] back and attached to cell bars in ways that ma[k]e it impossible either to stand up or sit down."  *Id*., Ex., at 149.

Furthermore, Professor Hawk reported that "because Reverend Kim was such a valuable target," he was likely "subjected to additional brutality" relative to other prisoners. Hawk Decl. ¶ 20; *accord* Supp. Downs Decl. ¶ 8. The additional declarations and testimony that Plaintiffs have submitted from the *Warmbier* litigation also corroborate the harsh treatment Reverend Kim likely endured. *See* Dkt. 24-22 ¶¶ 15–18; Dkt. 24-24 ¶¶ 18–20; Dkt. 24-25 at 108–136. North Korea undoubtedly "intentionally inflicted" upon the Reverend "severe pain or suffering." 28 U.S.C. § 1605A(h)(7); *id*. § 1350 statutory note.

So, too, does the evidence show that North Korea targeted Reverend Kim for his religious and political dissent—another requirement to meet the definition of torture. *See* 28 U.S.C. § 1605A(h)(7); *id*. § 1350 statutory note. Professor Hawk reported that Reverend Kim was targeted for his "political dissent" and "humanitarian activities" in his missionary work. Hawk Decl. ¶ 21. Downs concurred that he is "virtually certain" that "political considerations" motivated North Korea's torture of Reverend Kim. Supp. Downs Decl. ¶ 7; *accord* Downs Decl. ¶ 34.

As to extrajudicial killing, Plaintiffs "need demonstrate only that [North Korea] killed the Reverend without due process." *Han Kim II*, 774 F.3d at 1050. Professor Hawk averred that he "believe[s]" that Reverend Kim suffered an "untimely death" from "torture and eventual starvation." Hawk Decl. ¶ 20. And Downs reported that in his expert opinion, "Reverend Kim was killed by his North Korean captors." Supp. Downs Decl. ¶ 7.

Altogether, these representations make clear that after abducting him from China, North Korea tortured and eventually killed Reverend Kim without due process. Plaintiffs have submitted evidence "satisfactory to the court" in support of default judgment, 28 U.S.C. § 1608(e), which the Court grants.

### D. The Court Awards Damages to Plaintiffs

Having determined it jurisdiction and North Korea's liability, the Court proceeds to the question of damages. The statute provides for compensatory and punitive damages. 28 U.S.C. § 1605A(c). At the September 29, 2025, hearing on Plaintiffs' Motion for Default Judgment, Plaintiffs requested that the Court assess damages based on their respective declarations without a formal hearing. The Court will do so, *see Weinstein*, 175 F. Supp. 2d at 21.

#### 1. Compensatory Damages

To qualify for compensatory damages, a plaintiff must prove damages "are reasonably certain (i.e., more likely than not) to occur" and that the requested amount is "a reasonable estimate consistent with [the D.C. Circuit's] application of the . . . rule on damages." *Hill v. Republic of Iraq*, 328 F.3d 680, 681 (D.C. Cir. 2003) (cleaned up). Plaintiffs here claim only compensatory solatium damages—or damages as redress for "the mental anguish, bereavement[,] and grief that those with a close personal relationship to a decedent experience, as well as the harm caused by the loss of the decedent's society and comfort." *See Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 25 (D.D.C. 2011) (alterations adopted) (cleaned up). Each has clearly suffered grievously because of North Korea's actions.

Young Hwa Chung Kim is the widow of Reverend Kim. She married Reverend Kim in South Korea in 1988 and immigrated to the United States in 1992. Young Hwa Chung Kim Decl. ¶¶ 4, 6. She, too, was involved in missionary work. *Id*. ¶¶ 2, 6. She recalls the Reverend's "constant displays of kindness and giving" throughout their marriage. *Id*. ¶ 5. Young Hwa Chung Kim's declaration describes how her mental and physical health deteriorated upon learning of her husband's abduction and death, with effects that continue "[t]o this day." *Id*. ¶¶ 12–26. She was eventually institutionalized for a period and was unable to take care of her son, Plaintiff Chun Kook Kim. *Id*. ¶¶ 17–18.

9

Butler, Reverend Kim's daughter, grew up in South Korea and initially immigrated to the United States on a student visa. Butler Decl. ¶¶ 3–4. Butler remembers her father taking her along to many of his speaking engagements and then "mak[ing] the trips special and fun for" her "[o]n his down time." *Id*. ¶ 12. She avers that Reverend Kim "always made time to take us to concerts, special events, and traveling on family holidays." *Id*. ¶ 14. Butler describes, too, the depression and "[in]ab[ility] to function" that plagued her in the aftermath of the Reverend's abduction. *Id*. ¶¶ 33–60. For example, she "had to take time off" from her work as a teacher, and she experienced "difficult[y]" eating and sleeping. *Id*. ¶ 36.

Chun Kook Kim is Reverend Kim's son. He was ten years old at the time of his father's abduction. Chun Kook Kim Decl. ¶ 2. He recalls going to events related to his father's work and taking family trips as a child. *Id*. ¶ 5. His family had initially wanted to shelter him, so Chun Kook Kim learned of Reverend Kim's abduction only when other children from church informed him of the news. *Id*. ¶¶ 7–8. He describes how his mother, Young Hwa Chung Kim, was "no longer capable of caring for" him in the aftermath of these events, and how he consequently "had no real time for childhood, no carefree years." *Id*. ¶¶ 10–16. Rather, he "bounced from family to family"—including living with family friends who became his legal guardians from ages 13 to 17. *Id*. ¶¶ 13–14. He avers that in this time, he "never had the time to make deep lasting friendships." *Id*. Chun Kook Kim has recently begun to process his grief through therapy. *Id*. ¶¶ 24-28.

"Courts may presume that those in direct lineal relationships with victims of terrorism suffer compensable mental anguish." *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 403 (D.D.C. 2015). Here, it is abundantly clear that Plaintiffs maintained deep, emotional bonds with

the Reverend. Their declarations also establish how profoundly his abduction, torture, and death reshaped their lives.

The Court acknowledges that Plaintiffs' grief defies quantifying. Still, it must assess damages. It does so according to the best method available to it—by "treat[ing] like cases alike." *Salzman v. Islamic Republic of Iran*, No. CV 17-2475 (RDM), 2019 WL 4673761, at *17 (D.D.C. Sept. 25, 2019); *accord Heching v. Syrian Arab Republic*, No. 17-CV-1192, 2025 WL 2959909, at *2 (D.D.C. Oct. 20, 2025); *Lee v. Islamic Republic of Iran*, No. 19-CV-00830 (APM), 2024 WL 6100106, at *5 (D.D.C. July 31, 2024). In *Han Kim III*, the district court awarded the plaintiffs, Reverend Kim's son and brother, each $15 million in compensatory damages. 87 F. Supp. 3d at 290. That amount represented at the time approximately $1 million per year since Reverend Kim's abduction. *Id*. Plaintiffs Butler and Chun Kook Kim, as the children of the Reverend, are similarly situated to the plaintiffs in the *Han Kim* case. The Court therefore awards them each $20.5 million, which reflects roughly the size of the award in *Han Kim*, adjusted for inflation. *See CPI Inflation Calculator*, Bureau Lab. Stats., https://www.bls.gov/data/inflation_calculator.htm (last visited Oct. 28, 2025) (reflecting 37 percent inflation between April 2015 and September 2025).

As to Young Hwa Chung Kim, the Court considers the unique psychological anguish visited upon her because of her widowhood. Courts in this Circuit have often awarded a larger sum in solatium to spouses, in recognition of the unique devastation of losing a life partner. *See, e.g.*, *Surette v. Islamic Republic of Iran*, 231 F. Supp. 2d 260, 271–73 (D.D.C. 2002); *Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27, 51–52 (D.D.C. 2001); *Anderson v. Islamic Republic of Iran*, 90 F. Supp. 2d 107, 113 (D.D.C. 2000). Commensurate with these decisions, the Court awards Young Hwa Chung Kim $25 million in solatium damages.

### 2. Punitive Damages

Punitive damages "serve to punish and deter" FSIA defendants, rather than directly compensate victims. *See Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 55–56 (D.D.C. 2012); *see also Opati v. Republic of Sudan*, 590 U.S. 418, 427–28 (2020). "In determining the proper punitive damages award, courts evaluate four factors: (1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 30 (D.D.C. 2008) (cleaned up).

The Court agrees with the *Han Kim III* court that North Korea's actions were "awful and worthy of the gravest condemnation." 87 F. Supp. 3d at 291 (cleaned up). There is no question, from the evidence, that North Korea caused Plaintiffs significant psychological harm. *See supra* pp. 9–11. Additionally, North Korea's acts of abduction, torture, and extrajudicial killing merit strong deterrence. Finally, the Court notes that North Korea's wealth (which courts often measure by a state sponsor of terrorism's annual expenditures in support of terrorist activities), is not "readily accessible." *Han Kim III*, 87 F. Supp. 3d at 291.

In considering these factors, the *Han Kim III* court ultimately awarded the plaintiffs a combined $300 million in punitive damages. Heeding its duty to treat like cases alike, *see supra* p. 11, the Court will grant Plaintiffs' similar request, *see* Dkt. 28-1 at 28, for a combined $300 million in punitive damages for North Korea's abhorrent treatment of the Reverend.

### IV. CONCLUSION AND ORDER

In sum, North Korea is liable to Plaintiffs under the FSIA's terrorism for abducting, torturing, and killing Reverend Kim without due process. The Court hereby

**GRANTS** Plaintiffs' Motion for Default Judgment, Dkt. 28, and awards (1) solatium damages in the amount of $25 million to Young Hwa Chung Kim and in the amount of $20.5 million each to Butler and Chun Kook Kim, and (2) a total of $300 million in punitive damages to the Plaintiffs collectively; and

**DIRECTS** the Clerk of Court to close this case.

**SO ORDERED.**

This is a final appealable Order.  *See* Fed. R. App. P. 4(a).

Date: November 4, 2025

_____
ANA C. REYES
United States District Judge